**E. J. ALBRECHT COMPANY**

v.

**UNITED STATES.**

No. 42-55.

United States Court of Claims.
July 13, 1959.

James M. Guiher, Clarksburg, W. Va., for plaintiff. Steptoe & Johnson, Clarksburg, W. Va., George W. McQuain, Clarksburg, W. Va., and William B. Devaney, Washington, D. C., were on the briefs.

Francis X. Daly, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

MADDEN, Judge.

The plaintiff sues to recover alleged excess costs which, it says, it incurred in the performance of a construction contract with the Government. It says that the Government issued its notice to proceed, thereby starting the contract performance period to run, some four months before the worksite was available. The Government refused to extend the time for performance, in spite of the alleged unavailability of the worksite, and, the plaintiff claims, it was thereby required to make use of overtime, Sunday and holiday labor, and to use extra equipment, in order to complete the contract on time.

The Government defends on the grounds that the worksite was in fact available, that the plaintiff of its own choice delayed the beginning of its performance, and that, in any event, the plaintiff is bound by the decisions, adverse to it, of the contracting officer and the Corps of Engineers Board of Contract Appeals.

The contract in question, executed in November, 1949 was for the construction of a 270,000 kilowatt hydroelectric power plant and adjoining switchyard facilities at Wolf Creek on the Cumberland River in Kentucky. The Wolf Creek dam and

power station are an important unit in the plan of development of the Cumberland River Basin, and in the overall plan for the development of the Ohio and Mississippi River systems. The dam of the project, and also the substructure of the powerhouse and the cable tunnel in the switchyard adjoining the power plant, were the subject of another contract, let in 1946, to joint venturers, herein called Jones-Wright, which contract was nearing completion at the time involved in this case. The alleged delay of Jones-Wright in completing its work in the powerhouse substructure and the switchyard area was the cause, the plaintiff claims, of the unavailability of the worksite to the plaintiff.

Bids for the contract here in question were invited by the Corps of Engineers on August 15, 1949. The work included the placement of some 40,000 cubic yards of concrete and the installation of many units of heavy and complicated equipment, including six turbines weighing some 650 tons each. Much of this equipment was to be furnished by the Government, or by other persons.

The plaintiff's president, Mr. Albrecht, and its vice-president, Mr. Fry, inspected the site on several occasions prior to submitting the plaintiff's bid. They saw that Jones-Wright had not completed its work on the powerhouse substructure nor on the cable tunnel. They made no inquiry and the Government's representatives made no statement as to when the Jones-Wright work would be far enough along to make the worksite of the new proposed contract available. The proposed contract contained the usual article requiring the cooperation of the contractor with other contractors on the worksite.

The plaintiff submitted its bid on October 27, 1949, and on November 3 it was awarded the contract, its bid of $5,558,719 being the low bid by a considerable margin. After the correction of an inadvertent error in the contract, the plaintiff signed it on November 21. Before the signing, the plaintiff's officials had again inspected the site and were aware that the Jones-Wright work had progressed very slowly.

On November 22, 1949, the Government issued to the plaintiff its notice to proceed within ten days, which notice was received by the plaintiff on November 25. By the terms of the contract the plaintiff had 1,230 calendar days from November 25, 1949, i. e., until April 8, 1953, to complete the contract. On or about November 23, 1949, the plaintiff furnished the Government a preliminary progress curve study which provided for (a) a mobilization period of 130 days expiring April 4, 1950; (b) the first contract work to be done on the powerhouse substructure about March 5, 1950; and (c) the first contract work to be done leading to the installation of turbines and generators on April 5, 1950. We have made a finding that one reason for the rather long mobilization period proposed by the plaintiff was its disinclination to take over the powerhouse site, even if it had been available, prior to the end of winter weather and the period when floods could be expected.

During December 1949, the plaintiff placed orders for material and equipment, negotiated subcontracts, and contracted for the installation of public utility connections. In letters of February 7 and 10, 1950, to the Government, the plaintiff proposed a revised work progress schedule which provided for starting of concrete placement in late April and commencement on May 1, of work on installation of penstock extensions in the powerhouse, and work in the switchyard. This schedule showed dates about one month later than those named in the plaintiff's proposed progress curve submitted on November 23, 1949. The reasons were that in January and early February 1950, there had been two floods which had made work impossible in the powerhouse substructure, and that it had developed that the concrete plant ordered by the plaintiff would not be delivered on time.

On March 1 the Government turned over to the plaintiff for its use and responsibility the powerhouse substructure, advising that the Jones-Wright work

there was completed except for the removal of some items of equipment and material and the performance of certain items of repairing and finishing. The plaintiff was also orally advised that it was behind schedule in its work and was summoned to a conference to be held on March 6. On March 3, the plaintiff wrote a letter to the Government protesting the turning over of the substructure to it because the Jones-Wright work in it had not been completed, and because the switchyard area had not been backfilled to grade and therefore the plaintiff had not been able to build an access road from the plaintiff's campsite to the powerhouse. It also said that the failure to backfill and grade the switchyard area was delaying the plaintiff in the erection of its shops and warehouses.

At the conference on March 6 the contracting officer stated that the Government had made binding commitments to the Tennessee Valley Authority and the Atomic Energy Commission for an early supply of electricity from the new power plant and that no delay in the contract completion dates for the first two generator units could be permitted. The contracting officer gave the plaintiff a proposed revised work schedule which set an October 15, 1950, date for the completion of the site for the erection of generator No. 6. The plaintiff protested the revised work schedule, stating reasons why it did not need to be accelerated so greatly. The concrete plant ordered by the plaintiff on December 23, 1949, was, because of a strike, delivered so late that it was not in operation until June 6, 1950, though it had been scheduled to be in operation by May 1. The contracting officer granted the plaintiff a 37-day extension of time on this account. The plaintiff needed concrete on and after May 3, received permission from the contracting officer on May 16 to purchase concrete from Jones-Wright, but did not purchase any because its own plant was soon to be ready for operation.

Jones-Wright had filled the switchyard area up to grade by April 15, 1950, and the plaintiff could then have built its access road from its campsite to the powerhouse. It did not begin to build the road until after May 11, and did not finish it until June 2. At the time the plaintiff made its bid, the Jones-Wright contract provided for completion of all of the Jones-Wright work, including the cable tunnel, by March 30, 1950. Until the cable tunnel had been completed, the plaintiff could not have done its erection work in the switchyard area, since that work was to be placed on top of or in close relation to the tunnel.

The plaintiff, as we have seen, claims that the Government wrongfully issued its notice to proceed at a time when the worksite for the plaintiff's work was not accessible. It does not claim to have been damaged by reason of assembling, because of the notice, men and equipment which stood idle because the worksite proved to be unavailable. It claims only that the notice shortened the contract period and thereby compelled the plaintiff to make extraordinary expenditures to finish its work within the shortened work period. The plaintiff must, we suppose, persuade us that it was ready and willing to get to work in the substructure of the powerhouse and in the switchyard and was, against its will, prevented from doing so by the uncompleted work of Jones-Wright.

The plaintiff, in its petition, claims that it should have had access to the substructure by December 5. On November 23, without any protest or suggestion of dissatisfaction, it set the date as March 5, 1950. If it had wanted to get at its work sooner than that, it would have requested and urged the Government, or Jones-Wright, or both, to expedite the work and get out of its way. No doubt during the floods in January and early February it was quite content not to be in the substructure, and not to have the responsibility and expense of cleaning out the debris and mud deposited by the floods.

The plaintiff claims that it was harmed by not having its own access road from its campsite to the powerhouse, because of the tardiness of Jones-Wright in filling

and grading the switchyard over which the access road was to be built. As we have seen, the grading was done by April 15, but the plaintiff did not begin to build its road until after May 11, and did not complete it until June 2. This is not the conduct of one who is ready and anxious to get ahead but is being held back against his will. The plaintiff claims that it was harmed, again by the delay in the grading of the campsite, because, among other things, it could not construct the foundation for its cement mixer. Because of a strike for which neither party was responsible, the cement mixer was not delivered to the job until long after the grading had been finished. If the plaintiff had been anxious to proceed with placing cement before it finished its access road, it could have bought cement from Jones-Wright, yet it did not do so.

Our conclusion is that the plaintiff had access to its worksite substantially as soon as it wanted it and could make use of it, and cannot fairly charge the Government with delaying its work.

■ As to the floods, of course the Government is not chargeable with breach of contract because they occurred. The plaintiff says that, under Article 9 (c) of the contract, it was entitled to an extension of time because of the unanticipated occurrence of the second flood. The evidence however shows that the occurrence of two floods in one winter was not unusual on the Cumberland River.

The parties have discussed at length the weight which the court should give to the decision, adverse to the plaintiff, of the contracting officer, affirmed by the Board of Contract Appeals. The instant contract provided finality for such a decision, and the Wunderlich Act of May 11, 1954, 68 Stat. 81, 41 U.S.C.A. § 321, confirms such finality unless the decision is

> fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.

The plaintiff's attack upon the administrative decision here is upon the ground that it is not supported by substantial evidence. Since we think it is so supported, both on the record before the contracting officer and the board, and on the record before this court, it is not necessary to discuss the question mooted in Volentine & Littleton v. United States, 145 F.Supp. 952, 136 Ct.Cl. 638, and Fehlhaber Corp. v. United States, 151 F.Supp. 817, 138 Ct.Cl. 571, certiorari denied 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108.

The plaintiff's petition will be dismissed.

It is so ordered.

FAHY, Circuit Judge, sitting by designation, JONES, Chief Judge, and LARAMORE and WHITAKER, Judges, concur.

**L. A. ANDERSON et al.**

v.

**UNITED STATES.**

No. 441–56.

United States Court of Claims.
July 15, 1959.

