MaddbN, Judge,
delivered the opinion of the court:
Tbe plaintiff had a contract with the Government to construct maintenance hangars and related facilities at the Ardmore Air Force Base at Ardmore, Oklahoma. The work included the construction of a number of reinforced steel and concrete caissons some 50 feet deep, as foundations for the hangars. The concrete in fifteen of the caissons did not have the compressive strength required by the contract, and the plaintiff was required by the Government to remedy this defective work by placing additional caissons adjacent to the defective ones. The cost of the remedial work was some $14,000. The plaintiff says that the weakness of the concrete was due to the fault of the Government in designing the concrete mis, and that the Government had no right to require the plaintiff to remedy the defect at the plaintiff’s own expense. The instant suit is for the recovery of the cost of the remedial work.
The plaintiff subcontracted the construction of the caissons to a partnership hereinafter called Saxet. Saxet obtained its concrete from a corporation hereinafter called Ardmore. The specifications of the plaintiff’s contract with the Government prescribed five and one-half bags of cement per cubic yard of concrete for the concrete mix for the caissons, but also provided that if the plaintiff should be directed by the contracting officer to use more or less than that amount of cement, the Government would pay extra for the larger amount and would receive credit for the smaller amount.
The specifications provided that the concrete in the caissons should be strong enough to bear a weight of 3,000 pounds per square inch (p.s.i.) when it had set for 28 days. Before the pouring of the concrete began, the Government concluded, from its experience with other concrete work at the same air base, under identical conditions, that concrete of the prescribed strength could be produced by using only five bags of cement per cubic yard. The contracting officer thereupon directed that only five bags be used in the plaintiff’s caisson work.
The contracting officer permitted the use of ready-mixed concrete for the caissons. It was brought to the site in *516 Ardmore’s trucks which, had revolving drums with fins inside them to mix the cement, crushed rock, sand and water. Before the concrete was dumped from the trucks into the caisson excavations, samples were taken from each truck load for testing purposes. There was a slump test, to determine the workability of the concrete, i.e., whether it would compact well around the reenforcing bars and at the outside of the caissons without leaving voids. The water content of the mix had a good deal to do with the slumping quality of the concrete. The result of the slump test could be determined immediately. But the test for compressive strength, made by placing sample cylinders of the concrete under pressure, after seven days for a preliminary test, and after 28 days for a final test, necessarily created the risk that caissons would be filled with concrete which had set beyond the possibility of removal, and the samples taken from that concrete at the time it was poured would show that the concrete was lacking in compressive strength.
The first concrete was placed in the caissons on July 2, 1954. The seven-day test of samples of that concrete showed that it had very little compressive strength. Concrete was placed in other caissons on July 6. The seven-day tests of this concrete showed that it was quite strong. Caissons poured on July 7 had an average compressive strength of 4,187 pounds p.s.i. after 28 days. Those poured on July 8 and 9 tested only some 1,500 pounds. The final 28-day tests of course came long after the pouring.
At a conference on August 11 of the Government’s representatives and representatives of the plaintiff, Saxet and Ardmore, it was agreed that the cement in the mix should be increased to five and one-half bags per cubic yard; that only two cubic yards instead of three should be mixed in the mixing trucks in each batch; that all the materials in each batch should be thoroughly mixed before the water was added; that the mixing drums on the trucks should be revolved 100 times, instead of not less than 50 nor more than 100, as the practice had been. In addition to these agreed measures, Ardmore was directed to spray the stockpile of crushed stone, which was to be used in the aggregate, every *517 day to keep it from being overdry and absorbing too much of the water in the mix.
The concrete work was resumed after August 11, and the new procedures were followed. None of the caissons poured after that time were rejected on the ground that they contained defective concrete.
Investigation continued as to how many of the caissons poured before August 11 were defective. Core borings taken from some of them showed the concrete, even within the same caisson, to have good concrete at one depth and weak concrete at another depth. In all, 15 caissons were found to be defective.
As we have seen, the plaintiff was required to remedy the defects. It says that the reason for the weak concrete was the Government’s reduction of the cement content from five and one-half bags to five bags per cubic yard. It points to the fact that there was no more weak concrete after August 11, when the use of the five and one-half bag mixture began. The Government says that the cement content in the mix was not the cause of the trouble; that other caissons at the same area and poured under the same conditions, with the five-bag mixture, were not defective; that ten of the 25 caissons poured by Ardmore before August 11, using the five-bag mixture, had the required compressive strength; that the Portland Cement Association, which would be interested in selling as much cement as possible, says in its manual that a five-bag mix will produce concrete having compressive strength of from 4,000 to 5,500 pounds per square inch.
After the remedial work had been done, the plaintiff submitted to the contracting officer a claim for the cost of that work. The contracting officer denied the claim on the ground that the defective concrete resulted from insufficient or improper mixing of the concrete by Ardmore. The plaintiff appealed to the Corps of Engineers’ Claims and Appeals Board which denied the claim on substantially the same grounds. The plaintiff appealed to the Armed Services Board of Contract Appeals. That Board adopted the findings and conclusions of the Engineers’ Board and denied the plaintiff’s appeal. This suit followed.
*518 The “Disputes Clause,” Article 6 of the plaintiff’s contract with the Government, provided that determination by the Board of Contract Appeals would,
* * * unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious or so grossly erroneous as necessarily to imply bad faith, be final and conclusive upon the parties hereto.
The Act of May 11, 1954, 68 Stat. 81, 41 U.S.C. § 321, which is the so-called Wunderlich Act, says that in situations where the contract provides for finality of the decision by the head of the pertinent Government department or his duly authorized representative or board, such decision
* * * shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.
See E. J. Albrecht Co. v. United States, 146 Ct. Cl. 299, 305.
The second section of the Wunderlich Act, 41 U.S.C. § 322, provides that an administrative decision on a question of law may not be made final, and the plaintiff urges that there was a question of law involved here, particularly insofar as the Government’s control over the concrete operation was concerned. However, the question before the contracting officer and the two appeals boards was the factual question of what was the reason for the failure of the concrete to have the required compressive strength. A conclusive answer to that question will never be had. The agency officials were confronted with conflicting evidence, and they made their decision adverse to the plaintiff.
The question before this court is a much narrower one. It is whether there was substantial evidence, i.e., such evidence as might convince a reasonable man, to support the conclusion reached by the agency officials. Whatever this court might have decided, if the case were before us as res nova, we have no doubt that there was, before the administrative officials, as there is before us, substantial evidence to support the conclusion which those officials reached. We must therefore hold their decision to be “final and conclusive.”
*519 The plaintiff’s petition will be dismissed.
It is so ordered.
LaRAMoee, Judge; Whitaker, Judge, and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and argument of counsel, mates findings of fact as follows:
1. Plaintiff, hereinafter sometimes called Bateson, is a Texas corporation which, on April 23, 1954, entered into a written contract with the defendant, whereby plaintiff agreed to furnish the labor, material, plant, and equipment required for constructing maintenance hangars and related facilities at the Ardmore Air Force Base, Ardmore, Oklahoma. The work required under the contract included the construction of a number of reinforced steel and concrete caissons as foundations for the hangars, and Bateson sublet that portion of the work to Saxet Foundation Company, a partnership, hereinafter called Saxet. Saxet obtained the necessary concrete from Ardmore Concrete Material Company, Inc., hereinafter referred to as Ardmore.
Bateson brought this action on behalf of Saxet to recover damages allegedly sustained as a result of defendant’s rejection of a number of the caissons and its requirement that remedial caissons be provided.
2. The contract between Bateson and defendant contained a schedule of designations and unit prices which specified the diameter of caissons, the estimated lineal feet, and the unit price to be paid per lineal foot of concrete and per pound of reinforcing steel. The unit price specified per barrel of cement was $3.20 and with respect thereto the contract stated:
Adjustment for Variation from the Specified Average Cement Content of Concrete in Maintenance Hangar, other than in 14-inch Hangar Floors. The Contractor will be paid for all extra Cement used due to a higher Cement Content at the Unit Price Stated herein. The Government will be Credited for all Cement not used due to a Lower Cement Content at the Unit Price stated herein.
*520 3. Article 9 of the contract between Bateson and defendant provided that all material and workmanship would be subject to inspection, examination, and tests by the contracting officer and stated that the Government would have the right to reject defective material or workmanship or require its correction.
Article 6 of the contract contained the following “Disputes Clause”:
6. Disputes. — Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the contracting officer, who shall reduce his decision to writing and send by registered mail, return receipt requested, a copy thereof to the contractor at his address shown herein. Within 80 days from the receipt thereof, the contractor may appeal in writing to the Chief of Engineers, whose written decision thereon, or that of his designated representative or representatives, shall be final and conclusive upon the parties hereto unless, within 30 days after the receipt thereof by the contractor, he appeals in writing to the Secretary, which appeal shall operate to vacate said decision of the Chief of Engineers. If the dispute is determined by the Secretary, his written decision or that of his designated representative or representatives, shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious or so grossly erroneous as necessarily to imply bad faith, be final and conclusive upon the parties hereto. The Chief of Engineers or the Secretary may designate an individual, or individuals, other than the contracting officer, or a board as his authorized representative to determine appeals under this article. In connection with any appeal proceeding under this clause, the contractor shall be afforded an opportunity to be heard and offer evidence in support of his appeal. Pending final decision of a dispute hereunder the contractor shall proceed diligently with the performance of the contract and in accordance with the contracting officer’s decision.
4. Pertinent provisions of the specifications attached to and forming a part of the contract read as follows:
SC-18. TESTING 03? MATERIALS AND EQUIPMENT:
a. Responsibility. — The contractor shall be responsible for the compliance of all materials, products and *521 equipment with the requirements of the specifications. Where the specifications require tests to determine compliance with the specifications, such tests shall be accomplished bj the contractor and at his own expense, except where specified that tests will be made by and at the expense of the Government. Whenever such tests are made, compliance shall be proved to the satisfaction of the contracting officer.
‡
Section II — Concrete
2-07. Samples and Testing.
(a) General. — Except as otherwise specified, testing of the aggregate and reinforcement shall be the responsibility of the contractor. The testing agency shall be approved. Testing of end items is the responsibility of the Government. Samples of concrete for strength tests of end items shall be provided and stored by the contractor when and as directed.
* * * * *
(e) Concrete
(1) Strength Tests During the Worh.- -The contractor shall provide for test purposes one set of three cylinders or one set of three beams taken from each 250 cubic yards or fraction thereof, or each day’s pour, whichever is less, of each class of concrete placed. * * * The standard age of test shall be 28 days, but seven-day tests may be used, with the permission of the contracting officer, provided that the relation between the seven-day and 28-day strengths of the concrete is established by tests for the materials and proportions used. * * * * * * * *
2-11. Classes of Concrete and Usage.
(a) Strength Requirements. — Concrete of the various classes required shall be proportioned and mixed for the following strengths:

* * ❖ * *
2-12. Proportioning of Concrete Mixes. — Concrete shall be proportioned by weight.
*522 (c) Control. — The design of the concrete mixture, to meet strength requirements of the class or classes of concrete specified, shall be the responsibility of the contracting officer. In designing the mix, aggregate proposed for use by the contractor and approved by the contracting officer will be used. The design mix will be determined well in advance of commencement of the work so as to cause no delay.
(1)Mix Design. — Before placing any concrete, adequate quantities of the concrete ingredients proposed for use shall be supplied to the contracting officer for making trial design mixes. In case of change in source or character of concrete ingredients after concrete placing has started, sufficient quantities of ingredients, including the new material, shall be furnished the contracting officer for determining a new mix. No substitutions shall be made in the materials used in the work without approval of the contracting officer. Average cement content will be as follows:

(2)Slvmip Test. — Consistency will be determined by the slump test, in accordance with CBJD-C 5. The slump shall fall within the following limits:
Type of Structure Slump for Vibrated Concrete,* Inches Minimum Maximum
General building construction, including slabs on grade.
(3)Mix Proportions. — Preliminary mix proportions will be furnished the contractor by the contracting officer before start of operations. Adj ustment will be made by the contracting officer, as required, to determine final proportions which will best satisfy job requirements and use of materials. Subsequent adjustment in these final mix proportions will be made by the contracting officer as required to compensate for variations in the gradation *523 and moisture content of tbe aggregates. Necessary revisions in water-cement ratio and concrete mix proportions shall be made as directed.
‡ ‡ $
(5) Strength Tests. — The contracting officer will determine the strength of the concrete in the completed work during the progress of construction by test specimens made, cured, and tested as specified herein under SAMPLES AND TESTING. Modifications of the design mix, if required will be made by the contracting officer on the basis of the strength of these test specimens. * * * * *
2-14. Beady-Mixed Concrete. — Keady-mixed concrete may be used unless disapproved by the contracting officer. Except for materials herein specified, ready-mixed concrete shall conform to A.S.T.M. Standard C 94.
tji íji
2-28. Payment. — No separate payment will be made for the work covered under this section, and all costs in connection therewith shall be included in the contract lump-sum price for the item to which the work pertains. There will be no additional compensation for changing the proportions of the mix to overcome field and aggregate deficiencies or to obtain the specified qualities and characteristics of the concrete. Adjustment in payment will be made at contract unit-price bid for cement more or less than the average bags per cubic yard specified hereinbefore for a given mix.
5. The subcontract entered into between Bateson and Saxet provided that Saxet would furnish all of the labor, materials, tools, and equipment, except the reinforcing steel, that would be required to complete the caissons in strict accordance with the prime contract, its plans and specifications. The subcontract further provided:
It is the intent of this contract to include everything necessary and required for a complete and acceptable installation of all Caissons as shown on subject plans and outlined in subject specifications and addenda. Caissons are more specifically outlined in Section 1A, entitled “Caissons”, of subject specifications and this contract includes this complete section, with the exception of the reinforcing steel. This material will be delivered F.O.B. cars to nearest rail siding by the Contractor and Subcontractor will unload, haul to jobsite *524 and erect in place. In addition to tbe above subcontractor will do all labor and furnish, all materials required to complete the Caisson Belling. Subcontractor will be paid the lump smn amount in accordance with Item 66A on the above Unit Price Schedule.
*****
All materials and/or workmanship is subject to approval of Corps of Engineers, U.S. Army.
The defendant authorized plaintiff to use ready-mixed concrete, and Saxet issued a purchase order to Ardmore which agreed to furnish 2,000 cubic yards of ready-mixed concrete in strict accordance with the provisions and specifications of the prime contract. The purchase order stated in part:
All concrete will have a cement content of 5y2 sacks per cubic yard.
*****
Cement to be adjusted up or down @ $0.95/sack. Ardmore supplied all the concrete used for the caissons during the period from July 2, 1954, until sometime in November of that year. The concrete for the remainder of the caissons constructed after Ardmore left the job was supplied by Bateson.
6. Section 2-11 of the specifications provided that the concrete for the caissons was to be Class A concrete having a minimum compressive strength at 28 days of 8,000 pounds per square inch. In section 2-12 of the specifications, it was stated that the average cement content for the Class A concrete would be 5.5 bags per cubic yard, but after several of the caissons had been excavated, inspected, and were ready for the placement of concrete, the defendant, through its Corps of Engineers, furnished a design for the materials to be used by Ardmore and Saxet in making concrete. The design provided for the use of 5 instead of 5y2 bags of cement, plus 6 gallons of water and aggregate in specified proportions per cubic yard. This design was used from July 2, 1954, when concrete was first poured, until August 11, 1954.
7. The defendant’s decision to specify the use of 5 rather than the 5 y2 bags of cement was based in part on records compiled by the Corps of Engineers, showing the compres *525 sive strength of concrete made from tbe same or similar designs and used on several previously completed contracts at tlie Ardmore Air Force Base. The crushed limestone, sand, and cement used in mixing the concrete throughout the performance of the contract involved here came from the identical sources that supplied the materials for the concrete poured in the earlier construction at the base. The records showing the experience on the other construction referred to reflected that the 5-bag design would produce concrete of the compressive strength required by Bateson’s contract.
The defendant’s decision was also dictated in part by its desire to save the Government the cost of half a bag of cement per each cubic yard of concrete placed. As shown in findings 2 and 4, 'both the contract and specifications allowed the Government a credit for all cement not used on account of a lower cement content for the concrete.
8. The equipment used by Ardmore for batching, mixing, delivering, and pouring the concrete was inspected by defendant’s engineers before any concrete was produced or delivered. The equipment consisted of bins for storing the crushed limestone and sand, scales for weighing materials, a well to provide the necessary water, and several transit mix trucks. Ardmore’s plant and equipment were located on the Ardmore Air Force Base at a distance of about % of a mile from the site of Saxet’s work and adjacent to a railroad siding. The cement was shipped in railway cars to the siding near the plant and removed from the cars as needed.
9. The first placement of concrete was in caissons Nos. 18 and 49 on July 2, 1954. All concrete placed was subject to the approval or rejection of the Government through its engineers. "When the first transit mix truck with concrete arrived at the site, a slump test was made by the defendant’s inspector. The test showed that the concrete was too stiff and the slump not low enough for placement. Water was added to the mix, the drum on the truck was revolved again for several minutes, and a second slump test was made. More water was added, the drum was revolved for further mixing, and after a third slump test, a satisfactory slump was obtained and the concrete was poured. In order to ob *526 tain a slump that would meet the contract requirements and to avoid the necessity of adding water in the mixing trucks at the site, the defendant directed Ardmore to adjust the scales at the hatching site to allow 6.25 instead of 6 gallons of water for each bag of cement, and this scale setting was used until August 11,1954.
Slump is a measure of the consistency and workability of concrete rather than of its strength. A slump test is made by putting a small quantity of concrete in a container, removing the container, and measuring the distance in inches, that the concrete sags.
10. The strength of concrete is dependent upon the water-cement ratio of the design. According to a manual published by the Portland Cement Association, a 5-bag design with 6 gallons of water per bag- will produce concrete having a compressive strength of 4,000 to 5,500 p.s.i.[2] after 2,8 days. Since the association is interested in selling cement, the statement in the manual as to the quantity of cement required is on the conservative side.
While the strength of concrete is determined by the water-cement ratio, the quality and strength of concrete are also dependent upon a proper mixing of the fine and coarse aggregates with the water and cement. The adequacy of the mixing and the extent of mixing required are affected by the moisture content of the aggregates in relation to the amount of free water added and by the type and condition of the mixing equipment.
The addition of one-quarter gallon of water to the design mix has the effect of decreasing the strength by approximately '250 p.s.i.
11. The strength of concrete cannot be determined from visual inspection during the pouring process. The standard method of determining its strength is to make compression tests, at the end of 28 days, of cylinders taken from the batch as it is being placed. This test was provided for in the contract, and the acceptance or rejection of the caissons was dependent upon test results showing a compressive strength of 3,000 p.s.i. The contract also authorized 7-day cylinder tests which are not as accurate as the 28-day tests *527 but provide some indication of concrete strength. The cylinder tests of the concrete involved in this action were all made by the defendant through the Corps of Engineers.
Cylinders taken of the concrete poured on July 2, 1954, were shipped to the laboratory of the Corps of Engineers at Dallas 6 days thereafter for the 7-day test. Later, other cylinders that had been taken on July 2 were shipped to the laboratory for the 28-day test. On July 9, 1954, the project engineer received notice by telephone from the laboratory that a 7-day test of two cylinders taken on July 2 from caissons Nos. 18 and 49 indicated that the concrete had a compressive strength of 442 and 428 p.s.i. respectively. The message was confirmed in an official report, which stated that the cylinders appeared to be oversanded, deficient in cement, and could be broken apart as easily as specimens only 1 or 2 days of age. Since the results of the tests were so low, the project engineer felt that the cylinders had been damaged on the job or in transit to the laboratory.
Concrete was next placed on July 6, 1954, in caissons 25 and 46, and the official report of 7-day tests received July 15, 1954, showed that the concrete in these cylinders tested 2,790 and 2,800 p.s.i. respectively. This was considered a good result for a 7-day test and convinced the project engineer that the design was adequate to produce concrete of the required compressive strength in 28 days.
12. After receiving fragments of the concrete which showed such low strength on the first 7-day test, the project engineer and his assistants attempted to ascertain what caused the defects in the concrete. The design mix was reexamined, the water used by Ardmore was tested, and a careful inspection was made of the stockpiles of material to determine that the batches used were uniform.
13. During the period between July 15 and August 9,1954, the defendant’s inspectors also inspected Ardmore’s trucks in which the concrete was mixed and delivered. The manufacturer’s specifications for these trucks called for the mixing drums to revolve eight revolutions per minute, but it was found that they actually revolved only five or six revolutions per minute.
*528 On one of the trucks, the fins inside the drum had been replaced but were not in the same position as when the drum was manufactured. The project engineer decided that this condition tended to reduce the mixing and, at his request, the truck was removed from the job.
Another of the trucks had a worn-out motor which was difficult to start and delayed the mixing and placing of the concrete. When this condition was brought to the attention of Ardmore, the defective motor was replaced with a new motor.
It was also found that Ardmore was not thoroughly cleaning the mixing drums of the trucks at the end of each day’s placement in accordance with standard procedure. As a result, concrete had accumulated at the rear of the drum and had hardened to the extent that it had to be removed by the use of an air hammer. When the condition was discovered, Ardmore’s superintendent removed the hardened concrete and thereafter cleaned the trucks at weekly intervals.
14. On July 30, 1954, the project engineer received notice by telephone of the results of the 28-day tests on the cylinders from caissons 18 and 49. This oral notice and the written official report of August 2,1954, showed that the concrete had a compressive strength of only T'80 p.s.i.
The laboratory report of the 28-day tests on the concrete poured July 6, 1954, was received August 3, 1954, and showed an average compressive strength of 3,545 p.s.i.
On August 6, 1954, the project engineer received the 28-day test reports on the caissons that had been placed on July 7, 8, and 9, 1954. On the placement of July 7, the tests showed an average compressive strength of 4,187 p.s.i., whereas the tests for the placements of July 8 and 9 showed compressive strengths of only 1,510 and 1,680 p.s.i.
After examining the reports, the project engineer conferred with his superiors and on August 6, 1954, they decided to shut the job down. The contractor was so notified on the same day and was directed to prepare an excavation for placement on August 9, when a concrete expert from defendant’s division office was to be present for a conference and to observe the placement.
*529 15. During the period between July 2 and August 11,1954, the average daily temperature at the site of the work varied from 95° to 110° F. Such extreme heat lowers the moisture content of aggregates used in mixing concrete, heats the metals in the mixing plant and mixing trucks, and causes the mix to absorb more water than when such materials are mixed at lower temperatures. From time to time during the period stated, both Saxet and Ardmore complained to the defendant’s inspector and project engineer about the lack of workability of the concrete and asked that they be allowed to add more water to the mix.
At the time Bateson and Saxet were directed to stop the placement of concrete in the caissons, neither they nor Ard-more had requested that the job be shut down. However, on August 9, 1954, after Ardmore had learned of the results of the test showing the failure of some of the concrete to meet the requirements of the contract, Ardmore wrote Saxet in pertinent part as follows:
As you know the purchase order calls for 5 y2 sacks of cement; while we have been using, with the Corps of Engineers approval, only five sacks.
It is our desire to raise the cement content to 5% sacks per cubic yard for the next week until such time as the Corps of Engineers can obtain more cylinders for test and redesign our mix. We will absorb the expense of the additional cement for the.next week as it is our primary desire to have these cylinders break according to specifications.
The letter or a copy thereof was furnished to the project engineer.
16. The conference which was to have been held at the site on August 9 was postponed to August 11, 1954, because defendant’s concrete expert did not arrive at the air base until August 10 and spent the day in reviewing the design for the concrete mix, studying the reports of the tests, inspecting the stockpiles of material, and observing the mixing equipment and method of batching the concrete.
At the meeting, which was attended by the project engineer and defendant’s concrete expert, as well as by representatives of Bateson, Saxet, and Ardmore, it was mutually agreed that the following changes would be made in an ef *530 fort to obtain, concrete that would meet the contract requirements:
(a) The size of the batches in the transit mix trucks was to be reduced from the full 3-cubic yard capacity of the trucks to 2 cubic yards in order to prevent overloading the mixers, which were in a worn condition.
(b) The batching procedure was to be changed so as to add water after all of the dry materials had been put in the mixer and dry-mixed, whereas previously the water had been added to the sand and ground limestone before the cement was put in the mixer. This was done because dry materials are easier to mix thoroughly than materials charged with water.
(c) The specifications had provided that each batch of concrete was to be mixed in the trucks for not less than 50 nor more than 100 revolutions of the mixer drum at the rate of rotation designated by the manufacturer of the equipment. After August 11, 1954, 100 revolutions of the mixer drum were to be required for each batch. Also, a revolution counter was to be installed on each truck for the purpose of recording the number of revolutions in lieu of estimating the number by clock time.
(d) The cement content of the mix was to be increased from 5 to 5y2 bags per cubic yard to give the concrete more workability as requested by the contractor. As previously stated, Ardmore and Saxet had requested that more water be added to the mix, and Ardmore had asked that the cement content be increased from 5 to 5^ bags per yard. The water and cement ratio was to be the same, i.e., 6 gallons of water per bag. The addition of the one-half bag of cement added little, if any, strength to the concrete but did increase its workability.
17. In addition to the corrective procedures described in the preceding finding, the project engineer also instructed Ardmore to spray the coarse aggregate daily after August 11, 1954, for the purpose of equalizing the moisture content of the materials.
18. None of the caissons poured after August 11,1954, was rejected by the defendant for failure to meet the required compressive strength tests or for other reasons.
*531 19. The following table shows the results of the 28-day compressive strength tests of the cylinders taken from the caissons placed between July 2, 1954, and August 6, 1954, inclusive:

Caisson No. Compressive Dale Placed Strength

49 and 18_ July 2,1954 780
25 and 46_ 3545
2_ 4187
17 and 45_ Julv 8,1954 1510
51 and 26_ July 9,1954 1680
50_ July 10,1954 2397
52 and 54_ 13,1954 2813
41 and 71_ July 15,1954 2767
77_ 2993
gg_ July 19,1954 2511
76 and 103_ July 20,1954 2912
102 and 85_ 21,1954 2606
75_ 1954 2577
133 and 101 and 107. 2400
82 and 120 and 136_. 26,1954 2547
July 27,1954 2830
123_ July 27, 1954 3377
109_ July 28, 1954 3040
108_ July 28, 1954 3145
129 and 111_ 2277
126_ 1954 2970
117_ 30, 1954 3137
127_ 3, 1954 3390
135 and 110_ Aug. 3,1954 3730
112_ Aug. 4, 1954 1627
113_ 1954 1683
130_ Aug. 4, 1954 3313
122_ Aug. 5, 1954 2223
■
114_ 5, 1954 2727
128_ Aug. 6, 1954 4197
119_ Aug. 6,1954 2363
20. By letter of September 27,1954, the contracting officer notified Bateson that 14 caissons designated by numbers had been rejected for failing to meet the contract requirements of 3,000 p.s.i. and requested plaintiff to advise what remedial action it proposed to take regarding the rejected caissons. The letter further stated that there was a question as to the quality of the concrete in 16 other caissons and directed plaintiff to obtain core samples throughout the entire lengths of these caissons in accordance with paragraph 2-07 (e) (2) of the specifications and paragraph 9(c) of the contract.
Cores were taken from six of the caissons by the use of special equipment which reamed out 6-foot lengths of the hardened concrete from the top to the bottom of each pier. *532 Each core was numbered to indicate the number of the feet from the top of the pier that the particular section had been removed and both the Government and the contractor took segments of the core for testing purposes.
The independent laboratory employed by Bateson to test the cores reported that the concrete in caisson No. 33 ranged from 4,998 to 1,896 p.s.i., that in caisson No. 49 it ranged from 3,898 to 826 p.s.i., and that in caisson No. 122, it ranged from 5,848 to 848 p.s.i. Caissons Nos. 49 and 122 had been rejected and No. 33 had been questioned by the contracting officer in his letter of September 27, 1954.
. 21. On December 16,1954, the defendant notified Bateson that the compressive tests on the cores taken from caisson No. 33 showed that the pier was overstressed by approximately 47 percent and that corrective action was required. This brought the total number of rejected caissons to 15.
22. In order to compensate for the rejected piers, the defendant directed Bateson to have new drawings prepared and approved by the project engineer and to construct 27 remedial piers. In some instances, a supplemental pier had to be placed on either side of a rejected pier. Each of the supplemental piers was 24 inches in diameter and was reinforced with steel in the same manner as the original piers. The work was done by Saxet.
23. On April 21, 1955, after the remedial work had been completed by Saxet, Bateson submitted to the contracting officer a claim in the sum of $17,772 for the cost of installing the 27 remedial piers. By letter of August 25, 1955, the contracting officer sent Bateson written findings of fact and a letter denying the claim on the ground that the failure of the rejected concrete to meet the requirements of the contract was due to insufficient or improper mixing by Ardmore.
24. Bateson filed a timely appeal with the Corps of Engineers Claims and Appeals Board, which denied the appeal in its decision of September 5, 1956. The Board concluded that the understrength concrete was caused by improper handling and insufficient mixing. The Board also found that the weight of, the evidence was predominantly against Bateson’s contentions (1) that the failure of the concrete was *533 due to the mix design furnished by the Government and (2) that the Government had exercised complete control over the concrete operations and therefore could not charge the contractor with responsibility for defects in such operations.
In a further appeal taken to the Armed Services Board of Contract Appeals, Bateson stood on the record made before the Corps of Engineers Claims and Appeals Board, but the Government introduced evidence in its behalf. By its decision of June 11, 1957, the Board adopted the findings of fact and conclusions of law of the Engineers Claims and Appeals Board and denied the appeal.
25. In the summer of 1954, during the same time that the contract involved here was being performed, Ardmore supplied concrete for the Burton-Miller Construction Company, a prime contractor -which constructed a chapel building on the Ardmore Air Force Base in the same general area as the hangars being constructed by Bateson. The contract for the chapel building specified that the concrete was to have a compressive strength of 2,500 p.s.i, but the concrete furnished varied from 1,400 to 1,700 p.s.i. That portion of the concrete which failed to meet the strength requirements of the contract was rejected by the Government, which compelled the contractor to reimburse it for the cost of the defective concrete in place.
26. As previously shown, the defendant specified the design for the concrete involved in this case, fixed the slump at the point of delivery, and inspected the concrete as it was being poured. In addition, the defendant also inspected Ardmore’s equipment before any concrete was delivered. However, the mixing operation itself was under the control of Bateson and the subcontractors. Ardmore procured and batched the materials, placed them in its trucks, mixed the concrete, delivered it, and poured it in the caissons. Plaintiff has failed to establish by a preponderance of the evidence that the defective concrete was due to the mix design specified by the defendant or to the other controls which it exercised. Although the evidence is conflicting, the record in this case shows that the decisions of the Corps of Engineers Claims and Appeals Board and the Armed Services Board of Contract Appeals, to the effect that the defective *534 concrete was due to inadequate and insufficient mixing by Ardmore, are supported by substantial evidence, including the following:
(a) The manual published by the Portland Cement Association and records of the compressive strength of concrete supplied on other contracts at the Ardmore Air Force Base and mixed from the same kind of materials as were used in the contract in suit showed that the 5-bag design would produce concrete having a compressive strength of 3,000 p.s.i. after 28 days.
(b) During the same period in which the 15 rejected caissons were poured, Ardmore supplied concrete for 10 approved caissons having a compressive strength of more than 3,000 p.s.i.
(c) As shown in finding 20, the strength tests made by the independent laboratory employed by Bateson showed a wide variation from much below to considerably above the requirements of the contract in several of the caissons poured prior to August 11, 1954.
(d) Two segments of the core from the second 3-yard load of concrete placed in caisson 49, one of the rejected caissons, were offered in evidence. The section taken from concrete 9 feet below the top of the pier had a compressive strength of about 1,000 p.s.i. and was sanded, whereas the section taken from concrete 17 feet below the top of the pier had a compressive strength of approximately 3,800 p.s.i. and a high cement content. In the mixing procedure followed by Ardmore at the time the load of concrete was poured, the sand, coarse aggregate, and water were placed in the mixing truck before the cement was added. When materials are improperly mixed in a transit mix truck, the first concrete which comes out of the truck will have a high cement content. The evidence shows that the segment of the core which was formed from the first concrete that came out of the second 3-yard load had the greater strength and a higher cement content.
(e) For at least a part of the period between July 2 and August 6, 1954, when the rejected caissons were poured, Ardmore had some defective trucks and did not use adequate mixing procedures for some of the concrete furnished by it.
*535 26. There is no proof that the administrative decisions were fraudulent, capricious, arbitrary, or so grossly erroneous as necessarily to imply bad faith.
27. The contract between Bateson and its subcontractor Saxet contains no provision relieving the prime contractor from liability to the subcontractor on the claim here asserted against the defendant, nor does the evidence show that Saxet has in fact released the prime contractor from such liability.
28. In performing its subcontract, including the 27 remedial caissons, Saxet incurred a total cost of $137,296.60. The installation of the remedial caissons was performed concurrently with the work on other caissons originally specified in the contract and Saxet’s cost for the remedial work was not segregated on its books. However, there is sufficient evidence for allocating the total costs to arrive at a fair and reasonable cost for the extra work. The cost properly allocable to such work is the sum of $11.34 per lineal foot, or a total of $13,888.10 for the 27 caissons. An addition of 10 percent for reasonable profit results in a finding that Saxet’s total cost for the work involved in this suit amounted to $15,276.91.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and its petition is therefore dismissed.

When placing of concrete without vibration is approved, slump shall be from three to six inches.

 Pounds per square inch.