Whitaker, Judge,
delivered the opinion of the court:
Plaintiff entered into a contract with defendant under which it purchased, for the account of the defendant, four furnaces, to be used by plaintiff in the production of shells for defendant. The manufacturer designed and installed the hardening furnace, one of the four plaintiff purchased, according to plaintiff’s instructions, but the refractory material in the furnace was installed by a subcontractor. A monolithic inner dome at the top of the furnace was a part of the refractory material installed.
The furnaces were placed in operation in May 1958. About a year later, in July 1954, the electric company which supplied electric power to heat the furnaces temporarily cut off that service, making it necessary for plaintiff to shut down the furnaces. Upon inspection of the furnaces after they had cooled, it was found that the inner dome of the hardening furnace had partially collapsed. Plaintiff sues for the cost of replacing it.
The question presented is whether this was “in excess of normal requirements for maintenance or in excess of fair wear and tear.” If it was, defendant is required by the contract to reimburse plaintiff for the cost thereof.
When plaintiff presented a claim therefor to the contracting officer, he rejected it as not being in excess of normal wear and tear. He reduced his findings to writing as required by the contract. Plaintiff took an appeal to the *467 Armed Services Board of Contract Appeals, the authorized representative of the head of the department. This Board decided against plaintiff for the reasons set out in an extract from its opinion, quoted in Finding 10.
Our Trial Commissioner has found that “the decision of the Board, when viewed in the light of the entire record, is supported by substantial evidence.”
We agree with the Trial Commissioner. The only witness on the issue of whether this was ordinary wear and tear was defendant’s chief of the operations division of the San Francisco Ordnance District. A summary of his testimony is set out in Finding 12. If that testimony is to be credited, it was wear and tear which in the normal course of events might have been expected. Often such material lasted much longer than in this case; sometimes it did not. It was not possible to predict how long it would last. Because this was so, the manufacturer guaranteed the furnace, except the refractory material, against defects in workmanship and materials for one year, but it would not guarantee the refractory material at all.
The only evidence that might be considered to be contrary to defendant’s expert witness was three letters written plaintiff in response to telephone calls made by its officers. One was from another shell manufacturer, who said he had operated his furnace for three years without having to make such repairs. The other two were from the sales representative who had sold plaintiff the furnaces. In one the agency said this was the first such experience it had had, and in the other it expressed the opinion the trouble was due to faulty refractory material used by the subcontractor who installed the furnace.
Such testimony, if such it can be termed, does not show that there was no substantial evidence to support the finding of the Armed Services Board of Contract Appeals. If there was substantial evidence to support it, it was final under the disputes clause of the contract, which is Article V-A thereof.
We repeat: Our Trial Commissioner was warranted in finding there was substantial evidence to support the Board’s conclusion, and we agree.
*468 Plaintiff is not entitled to recover, and its petition will be dismissed.
It is so ordered.
Durfee, Judge; Laramore, Judge; Madden, Judge; and Jones, 0kief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a corporation organized and existing under the laws of the State of California, with an office in New York, New York.
2. On May 10,1951, plaintiff entered into a facilities contract with defendant, acting through the Ordnance Corps, Department of the Army. The contract provided for (1) purchase by plaintiff on behalf of the Government of certain machinery and equipment, (2) delivery by the Government to the plaintiff of certain other facilities, (3) use of such facilities by the plaintiff in production for the Government, and (4) preservation, maintenance, repair and standby of such facilities. The machinery and equipment were to be used by plaintiff under a related supply contract for the manufacture of 155 mm-110 shells.
3. Under the facilities contract, plaintiff purchased from a manufacturer selected by it four furnaces: a forging furnace, a nosing furnace, a draw furnace, and a jet rotary hardening furnace. They were installed by the manufacturer, but the refractory material used in them was installed by a subcontractor.
4. The facilities contract contained the following pertinent provision:
ARTICLE m-C. MAINTENANCE AND PRESERVATION
The Contractor shall at no expense to the Government protect, preserve, maintain and repair all schedules A and B facilities in accordance with sound industrial practice so as to insure their full availability and usefulness during the course of this contract; provided, however, that the Government shall reimburse the Contrae *469 tor for the reasonable cost of all repairs, replacements and restoration measures which are in excess of normal requirements for maintenance or in excess of fair wear and tear, when such repairs, restoration and replacements are directed or approved by the Contracting Officer. Nothing in this article shall preclude the Contractor from being reimbursed such costs as are properly alloca-ble under other contracts.
5. The furnace involved here is 17 feet in diameter and approximately 12 feet high with a rotating hearth and a single door for loading and unloading. The hearth is lined with firebrick. The outside walls are steelplate. The inside wall is lined with firebrick and serves as a foundation for the inner and outer domes. The inner dome is monolithic and is composed of a refractory material which is poured into forms in the manner of concrete. The outer dome is of firebrick with a covering of refractory material. The domes are about 13 inches apart and form what is actually the combustion chamber. Heat generated in this chamber is transmitted to the hearth below it through a series of holes in the inner dome. The furnace is fired with a mixture of gas and oil.
6. The four furnaces were placed in operation in May 1953. During the last week of June 1954, the Pacific Gas and Electric Company, which supplied power to plaintiff, advised that service would be cut off from July 3 through July 5, 1954. Therefore, on July 3, 1954, it was necessary for plaintiff to shut down the four furnaces, and in doing so it cooled them in accordance with the manufacturer’s cooling schedule. The hardening furnace had been shut off and cooled down twice previously — once in the summer of 1953 and again in December of that year.
7. The four cooled furnaces were examined on Sunday, July 4, 1954. There was no need for notable repairs in three of them, but it was found that the inner dome of the hardening furnace was partially collapsed. Complete replacement of the inner dome was necessary for continued operation of the furnace and part of the outside dome was also replaced. Plaintiff immediately notified the Army Ordnance District and promptly began replacement of the inner dome, using the same contractor who had performed the original installation. In the course of doing that work, *470 the structural design was changed to give greater strength to the refractory. The replacement wort was begun on July 4,1954, and completed July 13,1954, when the furnace was placed back in operation.
8. The jet hardening furnace and the other three furnaces operated satisfactorily from July 1954 until at least October 1956.
9. By letter of July 23, 1954, plaintiff requested the contracting officer to authorize an expenditure of .approximately $7,906.88 for the replacement of the monolithic firebrick dome in the hardening furnace. Plaintiff stated that the authorization should be granted pursuant to Article III-C of the contract on the ground that the restoration was beyond normal maintenance requirements and was not the result of normal wear and tear.
On August 23, 1955, the contracting officer informed plaintiff that as a result of a full and complete investigation, the defendant had determined that the work performed was normal maintenance and was not reimbursable under the terms of the contract. Plaintiff contested the disallowance of its claim and requested that the contracting officer make findings of fact and a decision under the disputes clause, which is Article Y-A of the contract. This article of the contract made the decision of the contracting officer final, in the absence of an appeal, and, in case of an appeal to the Secretary, it made his decision, or that of his authorized representative, final. Thereafter, on November 15,1955, the contracting officer issued formal findings of fact, denying plaintiff’s claim and concluding that the replacement of the refractory constituted ordinary maintenance and repair in accordance with sound industrial practice and, as such, was not within the normal maintenance provisions of Article III-C of the contract.
10. Plaintiff filed a timely appeal from the decision of the contracting officer to the Armed Services Board of Contract Appeals which, after a hearing, denied plaintiff’s appeal by decision dated December 17,1956. The decision read in part as follows:
The appellant contends that the normal maintenance requirements of furnaces of the type with which we are *471 concerned are limited to such, items as repair or replacement of burners and other combustion equipment, electrical components and mechanical drive equipment and should not extend to major replacements of the type described here.
The uncontroverted testimony of the Government establishes that refractories in furnaces of this kind require replacements at undeterminate intervals during the life of the furnaces and are considered “a wearing part” of the furnaces which requires periodic replacements during their lives in the same manner as any wearing part of a machine facility, and that it is normal to assume in the standard practice of the industry that several refractories may be replaced during the life of a furnace.
The evidence discloses that the dome of subject furnace failed after one year of operation, and that the material was not guaranteed by the company which installed the same. It has however operated satisfactorily since it was repaired in July 1954.
From the available evidence we are not convinced that the contracting officer erred in refusing to allow the claim of appellant for the repair of the furnace under discussion. In our opinion the repair of the dome, which was made of refractory material was not in excess of fair wear and tear and consequently was not com-pensable under the provisions of Article III-C (supra) of the Contract.
11. With the exception of evidence relating to the costs plaintiff incurred in repairing the furnace, the evidence offered in the trial of this case consists of the record of the Armed Services Board of Contract Appeals on the hearing of plaintiff’s appeal from the adverse decision of the contracting officer.
At the hearing before the Board, the parties stipulated certain facts which were not in dispute. Plaintiff produced only one witness, its chief accountant, who was at the plant when the failure of the refractory was ascertained. He did not testify regarding the cause or causes of the failure.
The only evidence offered by plaintiff and admitted by the Board with respect to the cause of the failure of the refractory were three letters written to plaintiff in response to telephone calls made by plaintiff’s officers. The first of these was a letter from another shell manufacturer, stating that it *472 bad operated tlie same type of hardening furnace in its plant from October 1952 to November 29,1955, and that it had not been necessary to make any major repairs to the refractory lining of the furnace or to do any repair work on either of the refractory arches, although a crack had appeared in one of the lower arches. The second was a letter of July 28, 1954, from the sales representative who sold the furnace to plaintiff, stating that the failure of the refractory was the first that the sales agency had experienced with the material used in casting it. The letter also stated that out of the many furnaces which the agency had sold, there was only one other furnace in which there was a failure of the refractory in the inner dome. A second letter from the sales agency, dated August 31, 1956, expressed the opinion that the collapse of the inner dome was due to faulty refractory material furnished to the subcontractor who installed the structure.
12. The only testimony offered at the hearing before the Board on the principal issue before it was that of defendant’s expert witness, who was Chief of the Operations Division of the San Francisco Ordnance District. He was a qualified engineer who had had experience in the requirements and operation of such furnaces during the period from World War I to October 10, 1956, when he was called as a witness. The following is a summary of his testimony:
(a) The monolithic refractory, or inner dome, in the hardening furnace is a wearing part of the furnace and, in the standard practice of the industry, must be replaced several times during the useful life of the furnace itself. There is no established normal or average period of time for which a refractory can be used without replacement, because of the many conditions which will cause it to fail or deteriorate. The length of service is affected by the materials used in mixing or casting the refractory and the manner in which the materials are mixed by the workmen; the installation, design, and curing of the structure; the operating temperature of the furnace, the frequency with which it is cooled, and the conditions of use. Because of the variables which control the length of service, refractories are not guaranteed by manufacturers or installers. In this instance, the company which designed and installed the hardening furnace for plaintiff *473 guaranteed the furnace itself against defects in workmanship and material for a period of one year, but the warranty did not apply to the refractory which was installed by a subcontractor.
(b) It could not be ascertained whether the break in the refractory occurred shortly prior to July 4, 1954, when the collapse was discovered or whether it occurred at some earlier date. The furnace had been shut down and cooled off on two previous occasions. When a furnace is shut down and cooled off, the life of the refractory is reduced because cooling creates a contraction in the material, whereas it expands when the furnace is started again. The more frequently a furnace is cooled and restarted, the shorter the life of the refractory. The reports submitted by plaintiff to the Ordnance District indicated that plaintiff had followed the manufacturer’s instructions in curing and cooling the furnace.
(c) Since a number of things could cause the collapse of this refractory, it is impossible to determine what caused the failure. The following are possible causes:
(i) In the course of the replacement work, the design of the refractory was changed to give greater strength to the structure. This is an indication that the original design was defective.
(ii) Excessive heat in a particular zone will cause a crack and an ultimate failure in a refractory. The heat charts show the temperature at which the furnace was operated but do not show the temperature in any particular zone. When the burners are operating improperly, a specific zone is subjected to excessive heat and consequent deterioration.
(iii) Another and more likely possibility was the particular mixture used in the preparation of the monolithic refractory or the maimer in which the materials were mixed. The San Francisco Ordnance District was unable to find any indication that the materials used did not meet the specifications required for such a refractory. A failure of the refractory due to inherent defects in the materials used by the installer would not constitute normal wear and tear. On the other hand, if there was a weakness in the design of the refractory, a failure resulting therefrom would be fair wear and tear for the particular design selected by the plaintiff. In the same way, a failure due to defective workmanship in the mixing of the refractory material or in the installation thereof would be considered fair wear and tear. For these rea *474 sons no installer of a refractory will guarantee the structure.
(iv) In addition to the four furnaces in plaintiff’s plant, the San Francisco Ordnance District had experience with six or seven other furnaces with monolithic domes and there had been no failure of a refractory in any of these. However, the Ordnance District had information that refractories in other furnaces of the same kind had to be replaced.
13. There is no pleading or proof that the decision of the Board was fraudulent, arbitrary, or capricious.[1] Also, plaintiff has not pleaded nor has it established that the decision is not supported by substantial evidence. The only witness who testified before the Board as to the issue involved here expressed the opinion that the failure was due to fair wear and tear and that the replacement of the refractory was a normal maintenance expense. The facts upon which his opinion was based are set out above.
Although there was some evidence from which the Board might have concluded that the collapse of the refractory was due to inherent defects in the material rather than to fair wear and tear, the decision of the Board, when viewed in the light of the entire record, is supported by substantial evidence.
14. Plaintiff paid the contractor who repaired the furnace the sum of $6,958.24. In addition, it expended $453.21 for direct labor, and overtime thereon amounted to $41.67. Its overhead rate was 90 percent of straight time labor costs or $407.89. The total cost paid by plaintiff and allocable to the replacement of the refractory is the sum of $7,861.01. This figure includes an undetermined amount spent in changing the design.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and therefore plaintiff’s petition must be dismissed.

 Apparently plaintiff intended to amend its petition to allege that the Board’s decision was fraudulent, arbitrary, or capricious, or that it is not supported by substantial evidence. However, the petition has not been amended.