Per Curiam :
Plaintiff, on behalf of itself and its subcon-
tractor, Preload Central Corporation, seeks an equitable adjustment for alleged changes in plaintiff’s contract to construct a concrete water pipeline and damages for alleged unreasonable delays by the Government, amounting to a suspension of work in performance of the contract. The posture of the case before the court is that at the conclusion of plaintiff’s case-in-chief defendant moved to dismiss under Pule 49(c) on the ground that upon the facts and the law plaintiff had not shown a right to recover. The Trial Commissioner, Marion T. Bennett, allowed defendant’s motion, subject to approval by the court. For reasons which appear later, the court affirms that ruling. We, therefore, adopt the Commissioner’s findings of fact and his opinion with minor modification, and the same will be set forth below as a basis for the judgment of the court.
There are several questions in this case but the threshold one is whether defendant’s motion to dismiss was timely made. The motion was made after defendant had introduced three exhibits used by it in cross-examination. We *258 are satisfied that defendant’s motion was timely within the meaning of Buie 49 (c), which is based on Buie 41 (b) of the Federal Buies of Civil Procedure, for the motion was “promptly” made before defendant opened its case-in-chief and after plaintiff’s case-in-chief was closed. It would be unreasonable to compel a defendant to forego proper cross-examination, as plaintiff urges, or risk forfeiture of its right to move to dismiss at the close of plaintiff’s case. The Commissioner’s views to the same effect have been stricken from his opinion to avoid a repetition of what we have restated in principle.
The basic question here is whether the administrative decision of the Corps of Engineers Claims and Appeals Board, adverse to- plaintiff, is final or whether it is illegal because “fraudulent, capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence,” as provided by the so-called “Wunderlich Act,” chapter 199, 68 Stat. 81,41 U.S.C. §§ 321-322 (1958).
The questions decided by the Board were essentially questions of fact and thus within its jurisdiction. Detailed findings of fact have been made as to what the Board considered. The Board’s decision was based on substantial evidence and was not in violation of any of the admonitions of the Wun-derlich Act. It is not necessary to reiterate the details set forth in the findings and in the opinion of the Commissioner. Suffice to say that it was plaintiff’s claim before the Board that certain tests which its subcontractor was required by the defendant to perform on the concrete water pipe required the subcontractor to overdesign the pipe to meet the tests and thus there was a change meriting an equitable adjustment and, further, that alleged delay of defendant in making certain alleged changes amounted to a suspension of work entitling it to increased costs incurred during the delay period. Upon the record plaintiff made before the Board, it was administratively determined that plaintiff and its subcontractor had agreed to perform the tests, that they did not amount to changes, and that the Government had acted expeditiously in resolving the disputes about the earth loads to be borne by the pipe and in making a change for which *259 plaintiff did receive an increase in contract price and a time extension. Plaintiff did not meet its burden of proof in supporting its allegations now repeated before the court. For this reason, if for none other, plaintiff’s case must fall and the Board’s decision must stand. This is so even considering plaintiff’s case before the Board in its most favorable light and giving the benefit of any doubt to plaintiff.
If more were needed to invalidate plaintiff’s claim, however, it could be found in two collateral issues wherein plaintiff has failed in the trial in the court. First, plaintiff has not proved its damages by merely seeking the difference between actual verified costs and payments made to it under the contract by defendant. The costs have not been shown to be defendant’s fault. No evidence has been offered to show it other than the record before the Board. Plaintiff offered only two witnesses, one an expert on prestressed concrete pipe who gave cumulative testimony about the tests and the other who testified as to how much it had cost plaintiff and its subcontractor to perform. Second, plaintiff offered no evidence to the court to undercut the findings and conclusions of the Board. Plaintiff offered only the evidence of the two witnesses mentioned and the administrative record considered by the Board, and rested. Having concluded upon examination of that administrative record that it fully supports the Board’s decision and nothing having been offered of a new nature to show otherwise, as plaintiff had opportunity to do, we can only uphold the Board and dismiss the complaint under Article 15 of the contract and the Wunderlich Act. The authorities are gathered in the Commissioner’s opinion which follows.
OPINION OP THE COMMISSIONER
Late in 1948 the plaintiff, River Construction Corporation, hereinafter referred to as the plaintiff, entered into a contract with the defendant, acting through the Army Corps of Engineers, for the construction of a 54-inch concrete water pipeline about 5,100 feet long at Chain of Rocks in Illinois, near St. Louis, Missouri. Preload Central Corporation, hereinafter referred to as Preload, submitted a proposal to *260 plaintiff for the manufacture and supplying of prestressed concrete pipe for the project. Preload’s proposal, including detailed plans and specifications, was submitted to the defendant, and plaintiff’s bid, as accepted by the defendant, contemplated the use of Preload’s pipe.
The work under the contract was performed by plaintiff and Preload. Preload’s costs incurred in performing the contract were in excess of its estimates and bid price. Pre-load claims that its costs were increased by actions of the defendant in requiring certain tests to be made, thereby increasing the design requirements for the pipe. Preload asserts that the defendant, in effect, ordered changes in the contract, but has failed to compensate Preload for the resultant increased costs, as required by the contract. The plaintiff also claims that its costs were increased by delays caused by defendant. The claims for increased costs were presented to and denied by the contracting officer, and appeal was made to the Corps of Engineers Claims and Appeals Board, which denied all of the claims that are here asserted.
At the outset, the issue before the court should be clearly defined. The plaintiff has presented its case as though the issue were whether in fact the defendant required Preload to do work which was in excess of the contract requirements.
Under the Wunderlich Act, ch. 199, 68 Stat. 81, 41 U.S.C. §§321-322 (1958), where a contract entered into with the United States as a party provides that the decision of a representative of the head of a Government agency, upon questions of fact, shall be final and conclusive, such decision shall be final and conclusive “unless the same is fradulent [sic] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.”
Article 15 of the contract involved in this case provided that the decision, upon questions of fact arising under the contract, “shall be decided by the Contracting Officer subject to written appeal by the Contractor within 30 days to the Head of the Department concerned or his duly authorized representative whose decision, shall be final and conclusive upon the parties * *
*261 The claims now before this court were decided in favor of the defendant by the Corps of Engineers Claims and Appeals Board, the duly authorized representative of the chief of engineers. There is no allegation that the Appeals Board decision was fraudulent. The issue before the court is, therefore, whether the Appeals Board decision was capricious, arbitrary, so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. Ivy H. Smith Co. v. United States, 154 Ct. Cl. 74, 82-83; E. J. Albrecht Co. v. United States, 146 Ct. Cl. 299, 305; P.L.S. Coat & Suit Corp. v. United States, 148 Ct. Cl. 296, 301-2, 307; Appalachian Floor Co. v. United States, 144 Ct. Cl. 11, 15; Carlo Bianchi and Co., Inc. v. United States, 144 Ct. Cl. 500, 506; Whitlock Corp. v. United States, 141 Ct. Cl. 758, 764, cert. denied, 358 U.S. 815; Volentine and Littleton v. United States, 136 Ct. Cl. 638. This issue is very different from the question of whether the Appeals Board decision was correct. This court may well disagree with the Appeals Board decision but unless the plaintiff has shown the defects described by the Wunderlich Act, there can be no recovery here. T. C. Bateson Construction Co. v. United States, 149 Ct. Cl. 514, 518. Even though there may have been evidence before the Appeals Board upon which it could have based a decision in favor of the plaintiff, the decision which the board made may still be found to have been supported by substantial evidence, when the whole record is considered. See Rheem Mfg. Co. v. United States, 153 Ct. Cl. 465-66, 474.
This does not mean, of course, that the mere fact that there is some evidence to support the administrative decision is sufficient. As the Supreme Court said in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, the “substantiality of evidence must take into account whatever in the record fairly detracts from its weight.” See also Russell H. Williams, et al. v. United States, 130 Ct. Cl. 435, 441. Further, the requirement that there be substantial evidence means such evidence as might convince a reasonable man to support the conclusion reached administratively. Bateson, supra, and Consolidated Edison Co. et al. v. National Labor Relations Board, et al., 305 U.S. 197, 229.
*262 It should be noted that tbe Wunderlich Act permits, and the contract involved in this case provides, finality for administrative decisions only on questions of fact, as distinguished from questions of law. See section 2 of the Wunderlich Act, ch. 199, 68 Stat. 81.
It is well established that questions of the interpretation of a contract are questions of law to be decided by the court. See, e.g., cases cited in Wunderlich, et al. v. United States, 117 Ct. Cl. 92, 212-214; Cramp Shipbuilding Co. v. United States, 122 Ct. Cl. 72, 97; Ready-Mix Concrete Co., Ltd. v. United States, 141 Ct. Cl. 168, 176; Associated Traders, Inc. v. United States, 144 Ct. Cl. 744, 750-751. Even the meaning of contract terms, however, has been stated to be a question for the jury, that is, a question of fact. See, e.g., Richardson v. City of Boston, 19 How. 263 (1856), where the Supreme Court stated, at page 270: “It is the duty of the court to construe written instruments; but the application of their provisions to external objects described therein is the peculiar province of the jury.”
In the instant case we are concerned with a problem similar to the application of contract provisions to external objects. The contract here established certain specifications for the work to be done. With one exception (the requirement of testing 16-foot sections), there is no dispute between the parties as to the meaning of these specifications. With the above-noted exception, which involves a question of law, the dispute is as to whether, as a matter of fact, the tests subsequently required by the defendant were so severe as to require the plaintiff to design a stronger pipe than it would have had to design merely in order to meet the specifications.
In many cases it is not easy to draw a line between so-called questions of law and questions of fact.[1] Usually, a factual discussion takes place in a context established by contract provisions. Facts have meaning in the light of categories established by the contract; for example, any discussion of pipe is based on a conception of what can properly be called *263 pipe under the contract. So the question of whether the required tests were too severe in some sense involves the question of the strength of the pipe described in the specifications, even though the parties do not directly differ on that question. Thus, the issue here in some sense involves interpretation of the contract, but, as we have said, contract interpretation almost always underlies factual discussion. The problem, then, is to determine whether the question of contract interpretation is sufficiently central to the problem for decision, or whether it is merely peripheral to an otherwise factual question. While the questions in this case appear fairly clearly to be ones of fact, it will be useful to review some of the cases decided by this court for the indications which they may provide as to what questions are questions of fact despite their relationship to contract interpretation.
This court has held that the question of whether material supplied under a contract complies with specifications is a question of fact. Crystal Soap & Chemical Co., Inc. v. United States, 103 Ct. Cl. 166, 174. See also P.L.S. Coat & Suit Corp. v. United States, supra, at page 301.
The questions involved in the instant case are quite similar to the changed conditions issue involved in Ivy H. Smith Co. v. United States, supra, where the court said it was required to treat a decision of the Corps of Engineers Claims and Appeals Board as final, absent arbitrary action. The changed conditions issue in that case involved the question of whether the material present on a pumping station construction jobsite was different than had been indicated in contract specifications. See also Henry E. Wile Co. v. United States, 144 Ct. Cl. 394, 395-397.
In Mitchell Canneries, Inc. v. United States, 111 Ct. Cl. 228, 245-249, a contract for the delivery of canned blackberries provided that the findings of fact of the contracting officer should be final and conclusive on the parties. The contract also provided that the contractor be excused for delay in making deliveries when the delay resulted from unforeseeable causes. The defendant’s contracting officer decided that the contractor’s failure to complete performance of the contract was due to an unforeseeable cause, adverse weather conditions. The defendant, in this court, *264 contended tbat tbe findings of the contracting officer amounted to a construction of the contract rather than findings of fact, in that they construed the contract as providing that blackberries should be supplied only from a certain area, such construction being necessary to excuse the contractor for not having obtained blackberries from an area not affected by adverse weather. The court held, however, that the decision of the contracting officer was on a question of fact. The instant case involves no more of a construction of the contract than did Mitchell Canneries. See also Palace Corp. v. United States, 124 Ct. Cl. 545, 546-549; cert. denied, 346 U.S. 815.
Associated Traders, Inc. v. United States, supra, is distinguishable from this case, and illustrates the kind of a problem where interpretation of the contract is central. Under the supply contract involved in that case, the parties had agreed that, in the event of termination for default, the Government had the right to procure supplies “similar to those terminated and the Contractor should be liable * * * for any excess costs for such similar supplies * * The plaintiff had defaulted and the Government had purchased supplies elsewhere. The Armed Services Board of Contract Appeals decided that the supplies purchased by the Government were not similar to the contract supplies, so the plaintiff was not liable under the contract for the costs thereof. When the Comptroller General refused to follow the board’s decision, and did not refund to the plaintiff the excess costs it had been assessed, the plaintiff sued in this court. The defendant challenged the board’s decision, and this court agreed that the decision was not binding, on the ground that it involved a question of law, concerning the interpretation of the contract. The court said, “It is the meaning to be ascribed to the word ‘similar’ as used in * * * [the contract] which is in issue here.” There was no dispute over the fact that the material purchased elsewhere complied with the contract specifications; the question was whether the contract’s reference to similar material meant identical material. Thus, the question centered on the meaning of contract language, and was held to be a question of law. See also Wm. A. Smith Contracting Co., Inc. v. United States, 155 Ct. Cl. 44, 46-48. *265 The question liere, on the other hand, centers not on the meaning of the contract, but on the nature of the tests required during performance of the contract. T. C. Bateson Construction Co. v. United States, supra.
Russell H. Williams, et al. v. United States, supra, involved an administrative decision which the court held to be one of a question of fact which had not been supported by substantial evidence. The contract provided for the excavation by the plaintiff contractor of certain borrow material. The contract provided that the plaintiff would be paid a certain amount per cubic yard of material removed, and also provided a method for measuring the yardage of material removed. The method was called the “average-end-area” method. During performance, a slide occurred in the quarry, making the use of the average-end-area method very difficult. The contracting officer, at the completion of the contract and by the average-end-area method, made a calculation of the material removed by the plaintiff. During the course of the contract performance, however, the plaintiff had been paid according to calculations made by another method, the “truck-measurement” method, which was not impeded by the quarry slide. The amount of material as calculated by this method exceeded the amount as calculated by the average-end-area method, but the contracting officer’s application of the latter was upheld by the representative of the department head authorized to hear appeals. The court said that even though the contract provided for the use of the average-end-area method, “the real question was how much material had been removed.” Thus, despite the fact that the decision of the administrative official involved consideration of the effect of the contract provision for use of the average-end-area method, the court concluded that the decision was on a question of fact, the amount of material removed, and would have been valid if supported by substantial evidence.
The question of contract interpretation, which may be present in some form in the cases which most clearly involve questions of fact, was very prominent in the Russell H. Williams case, yet the court concluded that it was dealing with a decision of a question of fact. The question of contract interpretation was much less prominent in the instant case. *266 Although tbe facts had to be considered in relation to the contract specifications, the questions decided by the Appeals Board were essentially factual ones of the severity of the tests imposed by the defendant.
The Corps of Engineers Claims and Appeals Board, in its opinion, characterized the questions it decided as questions of fact. The plaintiff appears to have acknowledged in its brief that the decision involved questions of fact.
It is concluded, therefore, that under the Wunderlich Act and the contract involved in this case, the decision of the Corps of Engineers Claims and Appeals Board on all of the issues except one was final and conclusive upon the parties, unless the plaintiff has shown the decision to be “arbitrary, capricious or unsupported by substantial evidence.”
At the trial of this case, the plaintiff introduced into evidence the transcript of the testimony taken before the Corps of Engineers Claims and Appeals Board. The transcript was admissible to prove what evidence was before the Appeals Board. That is, of course, highly relevant to the issue here, whether the decision of the Appeals Board was supported by substantial evidence. The plaintiff, however, seeks to have the transcript used as evidence of the matters which were testified to therein. The defendant objects on the ground that the transcript used for that purpose would be hearsay since it consists of unsworn, out-of-court statements which would be used to prove the matters stated. The defendant says that such use of the Appeals Board transcript would deprive the defendant of its right to cross-examine the witnesses against it.
The plaintiff’s position is that the parties and issues were the same before the Appeals Board as they are before this court, and the defendant had an opportunity to cross-examine witnesses when they appeared before the board. The plaintiff states that, “as a matter of convenience and practicality,” it would be difficult for it to gather again the witnesses who appeared before the board.
Because plaintiff has failed in meeting its burden of proof, both before the board and this court, it is not necessary for us to reach the issues posed in the two paragraphs just above in order to decide the case.
*267 The plaintiff’s claims in this court were based upon several contentions. The first contention concerns the letter which the defendant wrote to Preload on December 7,1948, by which it required Preload to subject its pipe to 3-edge bearing tests to twice the maximum loads expected to be imposed in the field. The plaintiff claims that this constituted an increase in the requirements for the pipe as established by the contract, and that the increase added to production costs for which Preload should have been compensated. The Corps of Engineers Claims and Appeals Board found, however, that the defendant’s December 7 letter stated that it was a conditional approval of Preload’s proposed pipe design and that Preload accepted the conditions of approval. The board’s decision was based on substantial evidence, and the plaintiff in this court made no showing to the contrary. The plaintiff’s evidence here consisted of testimony that the tests required on December 7 were extremely severe. This evidence could be accepted, but it would be entirely irrelevant to the issue of whether the board was arbitrary or capricious in finding that Preload had accepted the December 7 conditions.
The plaintiff’s other contentions are made in connection with certain additional test requirements imposed in a letter to Preload written on April 8, 1949. This letter required Preload to subject a sample of its pipe to a 3-edge bearing test to twice the expected maximum field load and then to subject the pipe to internal hydrostatic pressure which the pipe was required to withstand without leaking.
The plaintiff contends that the requirement of performing simultaneous 3-edge bearing and internal hydrostatic pressure tests compelled Preload to design pipe which was stronger and more costly than the pipe required by the contract specifications, which provided only that the pipe withstand field conditions. The Corps of Engineers Claims and Appeals Board found that the simultaneous test requirement did not exceed the contract specifications because (a) simultaneous internal and external pressure simulate field conditions, (b) prestressed pipe such as Preload was supplying can withstand external pressure to the point of cracking and then return to its former shape, with any cracks closed up, by reason of the springlike action of prestressing, (c) pursuant to *268 the December 7 letter, the pipe had already been designed against cracking at twice the maximum expected loads, and (d) the specifications according to which the pipe was manufactured required, not watertight pipe, but pipe which would leak less than a small, specified amount. There was evidence before the Appeals Board, described in the findings of fact below, to support all of these conclusions; the only contrary evidence to which the plaintiff points is testimony that simultaneous tests are rarely if ever imposed and they would be very severe. The plaintiff’s evidence before this court was limited to similar testimony. The plaintiff presented in this court only one witness on the subject of the test requirements. Substantially all of what this witness testified to with respect to the severity of the tests which the defendant required had been testified to by other witnesses before the Appeals Board. None of the considerations upon which the Appeals Board based its decision were contradicted by this witness. Kepe-tition in this court of essentially the same evidence as was relied on before the board cannot prove the plaintiff’s case without the presentation of any evidence to undercut the conclusions which the board reached.
The plaintiff also contends that the requirement that Pre-load test 16-foot rather than 8-foot sections of pipe compelled it to design pipe in excess of the contract specifications and led to increased costs. The Appeals Board decided that the requirement did not exceed the contract specifications, since the specifications did not mention the length of pipe to be tested. This question involves interpretation of the contract and is, therefore, a question of law, as to which the decision of the Appeals Board is not final. The plaintiff’s claim in this regard was properly denied, however, since the plaintiff presented no evidence before the board, or before this court, that Preload actually designed stronger pipe as a result of being required to test 16-foot sections. There was testimony that such tests would be difficult to perform. It would have been easy for the plaintiff to have presented evidence of the extent to which Preload strengthened its design as a result of the requirement. Having failed to produce such evidence, the plaintiff failed to prove its case in this regard.
*269 Finally, the plaintiff claims that the April 8 requirements caused Preload to manufacture the pipe by the Eocla process rather than by the vacuum process, a less expensive process which it had previously planned to use. The Appeals Board found, however, that Preload had in fact decided to use the Eocla process by early March 1949, prior to its receipt of the April 8 requirements. This finding was supported by substantial evidence, and the plaintiff has introduced no evidence before this court to challenge it. Again, all the plaintiff has done is to produce testimony that the April 8 requirements were stringent and that the Eocla process produces stronger pipe than the vacuum process. All this may be true, but the board’s finding that the decision to use the Eocla process was uninfluenced by the April 8 letter because it was made before the writing of that letter is in no way challenged.
Plaintiff claims that the findings and decisions of the contracting officer and the Appeals Board were arbitrary and not supported by substantial evidence. But, plaintiff has not shown this to be true. As the court said in Volentine and Littleton v. United States, supra, plaintiff must “do more than repeat the derogatory language of the statute.” He must allege and prove facts which will show that under the language of the statute the decision cannot stand. The proof here does not meet that test. It does not overcome the presumption of correctness of the administrative decision.
The plaintiff also claims certain damages for delays. This claim is based upon the suspension of work article, GC-11, in the contract, which provides:
* * * In the case of suspension of all or any part of the work for an unreasonable length of time causing additional expense or loss, not due to the fault or negligence of the Contractor, the Contracting Officer shall make an equitable adjustment in the contract price and modify the contract accordingly. * * *
The plaintiff says that a suspension of work resulted from the defendant’s delays in deciding on the type of pipe and the type of tests to be conducted.
The Corps of Engineers Claims and Appeals Board found that the defendant was diligent in attempting to resolve dis *270 agreements between the parties as to loads and tests. The plaintiff has pointed to some evidence before the board which indicated that the defendant’s representatives were not qualified in the field of prestressed pipe and appeared unsure of what they wanted. There was, also, evidence that during the entire period of delay claimed by the plaintiff negotiations between the parties were conducted with reasonable speed, and that a considerable part of the time claimed as delay was used by Preload in formulating proposals. In the light of the determination that the tests imposed by the defendant were not in excess of the contract, it cannot be said to have been unreasonable for the defendant to require that they be complied with. Delay, under the contract, must be for an unreasonable time in order to be compensable. The board’s decision that there was no unreasonable delay was not arbitrary or capricious, and was supported by substantial evidence. B-W Construction Co. v. United States, 97 Ct. Cl. 92, 113-114.
Since plaintiff has failed to show it is entitled to an equitable adjustment or suspension of work under the contract or that there has been a breach of contract, little need be said about damages. Plaintiff seeks here the difference between its actual verified costs and the payments made to it under the contract by defendant. Plaintiff seeks not only return of its total unpaid costs, and those of its subcontractor, but overhead and profit for both and damages for alleged delays. Plaintiff has offered proof as to what these costs amount to and what is desired and reasonable for overhead, profit and delays. Plaintiff has not shown that the costs, however, arose from defendant’s actions. Eecoverable damages cannot be proved by a naked claim for a return of costs even where they are verified. The costs must be tied in to fault on defendant’s part. Plaintiff’s claim is something like an attempt to secure damages based on the difference between costs and the contract price or a bid price. Such a method was rejected by the court in F. H. McGraw & Co. v. United States, 131 Ct. Cl. 501, 511, where the court stated:
This method of proving damage is by no means satisfactory, because, among other things, it assumes * * * *271 that plaintiff was not responsible for any increases in cost, and because it assumes plaintiff’s bid was accurately computed, which is not always the case, by any means.
Our opinion in Great Lakes Dredge & Dock Co. v. United States, supra, was not intended to give approval to this method of proving damage, except in an extreme case and under proper safeguards. * * *
The court has, while expressing dislike for it, computed damages by such a method in “extreme cases.” Great Lakes Dredge & Dock Co. v. United States, 119 Ct. Cl. 504, cert. den. 342 U.S. 953; MacDougald Construction Co. v. United States, 122 Ct. Cl. 210; Oliver-Finnie Co. v. United States, 150 Ct. Cl. 189.
On occasion the court has followed a jury verdict approach in computing damages. Penker Construction Co. v. United States, 96 Ct. Cl. 1; Needles v. United States, 101 Ct. Cl. 535, 618; Chalender v. United States, 127 Ct. Cl. 557, 566; Western Contracting Corporation v. United States, 144 Ct. Cl. 318. In all of these, and other cases which could be cited, the fact of damage was established and the responsibility of the defendant for it, and the question was how to compute reasonable damages from the evidence at hand. Here, however, plaintiff has not only failed to establish the fact of damage but has left the court without any fair yardstick to compute damages. A schedule of verified costs prepared as a part of pretrial procedure under rule 28 is not proof of damages but only the starting point from which they can be proved here in a trial de novo. Such a schedule verified by defendant is not an admission of anything but the accuracy of the statement reflecting the contents of books and records examined and the allocations and computations based thereon. Plaintiff’s one witness who testified about costs only verified that they were incurred on the job and for the part of the contract time he worked for Preload. That did not prove defendant’s responsibility for those costs nor their reasonableness.
FINDINGS OK PACT
1. Plaintiff, River Construction Corporation, hereinafter referred to as plaintiff, is a corporation organized and existing under the laws of the State of Delaware. It files this *272 suit for itself and for the use and benefit of its subcontractor, Preload Central Corporation, hereinafter referred to as Preload, a corporation organized and existing under the laws of the State of Missouri and with headquarters in Kansas City, Missouri. At all times material to this case, Preload has been engaged in the manufacture of prestressed concrete pipe.
The questions involved in this case have been decided in favor of the defendant 'by the contracting officer and the Corps of Engineers Claims and Appeals Board, hereinafter referred to as the Appeals Board. Some other questions presented to the Appeals Board were decided in plaintiff’s favor and were eliminated from consideration here by the first amended petition.
2. On or about October 1,1948, defendant issued to plaintiff and other prospective bidders its invitation, No. Eng-23-065-49-56, for bids for the relocation of a 54-inch concrete water line at Chain of Eocks Canal, Madison County, Illinois. The invitation stated certain specifications including those relied on by plaintiff, as follows:
2-04. Rbineoeced CONCRETE wateR pipe. — (a) General. — The pipe for the water lines shall foe reinforced concrete pressure pipe intended for use in water lines and shall conform to the requirements of the American Water Works Specification 7 B-T for “Tentative Emergency Specifications for Reinforced Concrete Pressure Pipe” and as hereinafter specified.
(b) Type.-— (1) That portion of the line which crosses under the proposed canal and levees between connection “B” on the east side of the canal and the lateral line on the west side of the canal shall be Type “A” pipe as prescribed in the above A.W.W.A. Specification, except that the minimum design head shall be 125 feet and in addition shall be designed to withstand safely the stresses created by a water stage of 437.5 feet in the canal with the pipe empty and to also withstand the load of the levee over the pipe, considering the levee as saturated sand.
(2) The pipe in the lateral line on the west side of the canal between stations 237 + 41.5 and 264 + 63 shall be Type “A”, “B”, or “C” as prescribed in the above A.W.W.A. specifications except that the minimum design head shall be 75 feet.
*273 (3) Oftional Type. — Eeinforced concrete water pipe of prestressed design will be accepted subject to the approval of the Contracting Officer provided that it meets the specified design requirements and has a record of performance at least equal to that of the pipe specified in (1) and (2) above.
(c) Specials. — Tees, curved sections, reducer sections and sections having manhole openings shall be provided as shown on the drawings. In all cases, the area of the steel reinforcement shall be not less than that for the adjoining straight pipe and the reinforcement shall adequately compensate for the openings in the pipe wall. Branch and manhole openings may be formed by steel rings or castings of suitable design securely welded to the cylinder and reinforcing cage. All bends and tees shall be provided with joints corresponding to those on straight pipe. Eeducer sections shall be flanged to match connecting valves.
(d) Joints. — Joints shall be rubber gasket or lead gasket type conforming to the applicable requirements of Section 3.9, Section 3.10, Section 4.6, Section 4.7 and Section 5.8 of the above stated A.W.W.A. Specification 7B-T.
(e) Shop Drawings. — Prior to manufacture the Contractor shall submit to the Contracting Officer for his approval detailed shop drawings of the proposed pipe and special sections, in accordance with the provisions of Part III, Special Conditions.
2-05. Installation or pipe. — (a) The concrete pipe shall be laid carefully on its bed or support to the correct gradient and alignment with the spigot end pointing in the direction of flow. Proper facilities shall be provided for lowering the sections of pipe into trenches.
(b) When each section of pipe is being laid, the spigot end of the pipe shall be entered into the bell of the adjoining pipe and forced home. The joint shall be an approved lead or rubber gasket type conforming to paragraph 2-04 (d) and shall be installed in such a manner as to keep the joint tight under all conditions of service including expansion, contraction and normal earth settlement. After the pipes are laid and gaskets properly installed, the annular recesses at the joints, both inside and outside of the pipe, shall be calked in accordance with the manufacturers recommendations and as approved by the Contracting Officer. The inside of the joint shall then be wiped and finished smooth.
*274 2-07. Tests. — After the pipes have been laid, the pipeline shall be tested to a head of 75 feet, either as a whole, or in convenient sections. During this test the leakage shall not exceed 100 gallons per inch of diameter per mile of pipe per 24 hours.
*****
GC-11. Suspension op work. — The Contracting Officer may order the Contractor to suspend all or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government. Unless such suspension unreasonably delays the progress of the work and causes additional expense or loss to the Contractor, no increase in contract price will be allowed. In the case of suspension of all or any part of the work for an unreasonable length of time causing additional expense or loss, not due to the fault or negligence of the Contractor, the Contracting Officer shall make an equitable adjustment in the contract price and modify the contract accordingly. An equitable extension of time for the completion of the work in the event of any such suspension will be allowed the Contractor, provided, however, that the suspension was not due to the fault or negligence of the contractor.
SC-01. COMMENCEMENT, PROSECUTION AND COMPLETION. — (a) The Contractor will be required to commence work under this contract within 10 calendar days after the date of receipt by him of notice to proceed, to prosecute said work with faithfulness and energy, and to complete the entire work ready for use not later than 180 calendar days after the date of receipt by him of the aforesaid notice to proceed, except as otherwise stated below. The time stated for completion shall include final clean-up of the premises.
By addendum No. 1, dated October 19, 1948, paragraph 2-07 of the invitation specifications was amended by substituting “head of 125 feet” for “head of 75 feet” and by deleting the last sentence of the paragraph.
S. On or about October 28, 1948, plaintiff submitted its bid for the work called for by the invitation. On the same date Preload submitted to plaintiff a proposal covering the manufacture of 54-inch prestressed concrete pipe and pipe specials as specified in defendant’s invitation. The use of *275 prestressed concrete pipe was permitted under paragraph 2-04(b) (3) of the specifications contained in the invitation, as shown above. Preload’s proposal stated in part:
Preload Central Corporation will furnish all plant, tools, and equipment and materials and labor and a competent engineer to inspect the jointing of the pipe, and deliver F.O.B. cars in Granite City, Illinois approximately 2700 lineal feet of 65 p.s.i. Prestressed Concrete Pipe, and 1700 lineal feet of 108 p.s.i. Prestressed Concrete Pipe and 700 lineal feet of 108 p.s.i. 4,000-D Pre-stressed Concrete Pipe all in accordance with the Engineers specifications and the Preload Corporation’s Preliminary Drawings Nos. 8P-535-2, 8P-535-3 and 8P-58&-4, and the detailed manufacturers specifications attached hereto.
4. On November 6, 1948, Preload submitted to defendant for approval a proposal for manufacture and furnishing of the pipe and specials with detailed but preliminary plans and specifications. On the same date Preload sent a copy of this proposal to plaintiff. The specifications thus submitted by Preload contained the following provisions:
1.1 GENERAL: This specification shall govern the furnishing and installation of Preload Prestressed Concrete Pressure Pipe and appurtenances meeting the requirements hereinafter specified. The pipe shall be of the design strength, diameter and dimension shown on the plans, and/or set forth in the special provisions for the project, and the installation shall be to the lines and grades shown on the plans.
The pipe shall consist of an imier core of concrete, cast by the Vacuum Process, or centrifugally spun by the Kocola Process diagonally wound with steel wire under a predetermined tension, and in the amount sufficient to stress the concrete pipe core in compression in accordance with the design requirements. The prestressing of the core shall be such that, with due allowance for elastic deformation, plus shrinkage and plastic flow of the concrete and wire, the concrete will remain in a condition of residual compression or zero stress when subjected, to internal pressures as hereinafter specified. After being wound with the prestressing wire, the wound core shall be encased in a mortar coating placed pneumatically..
Each pipe shall be constructed with a bell and spigot joint of the design shown on the plans. Such joint shall *276 be for use with an approved rubber gasket of the Flexlock type.
1.2 Design data
a. The pipe shall be made of Portland Cement Concrete. The length of the pipe shall be 16 feet in laying length from joint to joint.
The pipe shall be designed to provide for the operating and test pressures specified for this project.
In no case shall the pipe be designed for less than 200% of the operating head.
The prestressing wire shall be wrapped at a uniform pitch and at a constant stress of 140,000 psi. The core thickness and pitch of spacing of prestressing wire shall be such that the induced stress in the concrete core shall not exceed 2000 psi before shrinkage and plastic flow. The induced stress shall not be less than the amount required to provide for a residual compression or zero stress in the concrete of the core when the pipe is subjected to the internal hydrostatic heads provided above.
The dimensions of the straight pipe, minimum thickness of core and minimum thickness of mortar coating over the core shall be as follows:

Inside Minimum Mortar coating diameter core thicimess thielcness

Inches Inches Inches

54_ 3 %
54, 4000-D_ 3 1%
The manufacturer shall submit detail pipe design data for the review and approval of the Engineer before the manufacture of pipe is begun. Any adjustments in the design required by the provisions of this specification shall be made by the manufacturer.
3.3 Mix design and mixing concrete
The concrete shall be a design-mix of cement, fine aggregate, coarse aggregate and water proportioned to obtain a homogeneous, workable, dense and durable concrete of not less than 4500 psi compressive strength at age of 28 days, as determined by test specimens made, cured and tested as hereinafter specified. Not less than 7% sacks of cement shall be used per cubic yard of concrete and the water cement ratio shall not exceed 5.5 gallons of water per sack of cement. In determining proportions of aggregate and cement, all measurements shall be by weight. The maximum absorption as determined by test samples hereinafter specified shall not exceed 5%.
*277 All concrete for pipe shall be mixed in a batch type mixer for at least 2 minutes after water and all materials are in the mixer.
8.4 CONCRETE CORE CASTING, VACtFTTM PROCESS
The core shall be cast vertically by the vacuum process. The forms shall be vibrated continuously during the concrete placing operations. After the forms are filled, the vibration shall be continued and a vacuum shall be applied to the inside, outside or both sides of the pipe. The vacuum shall be gradually increased to not less than 20" of mercury, and the Vacuum Process shall be continued until the concrete is consolidated to a no-slump consistency. Additional concrete shall be placed in the forms to compensate for draw down and consolidation.
Immediately following the vacuuming period, the core and jackets may be removed.
SÜ ‡ * * *
8.10 Yard testing and inspection
The manufacturer shall furnish all the necessary equipment, materials and labor required for the making of the hydrostatic tests under the supervision of the Engineer. One length out of each day’s run may be selected at random by the Engineer for testing.
The pipe shall be tested at the yard for resistance to hydrostatic pressure by sealing or bulkheading the ends of the pipe and applying for 20 minutes a hydrostatic head equal to 150% of the net operating head. Before testing, the pipe shall be filled with water and allowed to stand under pressure of 10 pounds for at least 3 hours.
The pipe must stand these tests without cracking and with no harmful seepage. Water merely penetrating the shell of the pipe and adhering to its sides shall not be considered harmful seepage. In the event that a pipe fails to withstand such test, the manufacturer shall have the right to test two other sections of the pipe selected at random by the Engineer from the same day’s run from which the original pipe was selected. If these two pipes successfully pass the test, the remainder of that day’s run may be installed. If either of these pipes fail, then the remainder cannot be installed in the line until each pipe has satisfactorily passed this test. Pipe may be tested at 7 days or less for 90% or at 14 days or less for 100% of the net operating head at the option of the manufacturer for acceptance by the Engineer.
Each pipe may be checked for accuracy of dimension and shall not exceed the following requirements:
Variation of average interior diameters — 1%
*278 The core wall thickness shall not have a minus variation of over 5% from that specified.
# ❖ ❖ ❖ ❖
4.2 Field test
The installing contractor may test the pipe line in sections or as a unit when all of the pipe is at least 28 days old. All valves shall be closed, temporary bulkheads erected, if necessary, and the line slowly filled with water. Care shall be used to insure that all air vents are open during the filling. After the line, or section thereof, has been completely filled, it shall be allowed to stand under a slight pressure for a sufficient length of time to allow the concrete to absorb what water it will and to allow the escape of air from any air pockets. During this period, bulkheads and any other closed openings shall be examined for leaks. If any are found, they shall be stopped, or provisions shall be made for measuring the leakage during the test. The test shall consist of holding a pressure equal to 115' head measured at any predetermined location on the line for a period of four hours. The water necessary to maintain this pressure shall be measured through a meter or by other means satisfactory to the Engineer. The leakage shall be the amount of water entering the pipe line during the test, less the total measured leakage through valves or bulkheads, and (on the initial test only) an allowance of 1% of pipe weight for absorption. This leakage shall not exceed 100 gallons per day per inch of diameter per mile of pipe.
5. On or about November 9, 1948, defendant accepted plaintiff’s bid and awarded it the contract, No. W-23-065eng-1572, which was executed by the parties on that date. The amount of the contract was approximately $550,790. The contract contained, among other provisions, the following:
Article 1. Statement of worh. The Contractor shall furnish all plant, materials, equipment, supplies, labor and transportation, including fuel, power, water (except any materials, equipment, utility or service, if any specified herein to be furnished by the Government), and perform all work required for relocation of 54-Inch concrete water line at Chain of Rocks Canal, Madison County, Illinois; for the consideration of the unit prices stated in Schedule A, Sheet 1A, Page 2A, and Sheet IB, Page 2B; in strict accordance with the specifications, *279 addenda, schedule and drawings, all of which are made a part hereof and designated as follows: Specifications for Relocation of 54-Inch Concrete Water Line at Chain of Rocks Canal, Madison County, Illinois, Invitation No. Eng-23-065-49-56, dated 1 October 1948; Addendum No. 1, dated 19 October 1948; Addendum No. 2, dated 21 October 1948; Addendum No. 3, dated 22 October 1948; Schedule A, Sheet 1A, Page 2A, and Sheet IB, Page 2B, dated 22 October 1948; Schedule A, Sheet 1A, Page 2A, and Sheet IB, Page 2B; and drawings referred to in Paragraph SC-05 of the specifications.
The work shall be commenced and completed in accordance with Paragraph SC-01 of the specifications.
The unit prices for Items Nos. 3 and 4, and lump sum price for Item No. 5, as stated in Schedule A hereof, are based on the use of prestressed concrete pipe, meeting all requirements of the specifications, as manufactured by The Preload Central Corporation, Kansas City, Mo.
schedule a
Item No. Description Estimated quantity Unit Unit price Amount
Pipe; reinforced concrete; 54-incli I.D., straight sections, complete in place in crossing under levees and canal. 2,400 lin ft $47.00 $112,800.00
Pipe; reinforced concrete, 54-inch I.D., straight sections, complete in place in land lino. 2,700 lin ft 42.00 113,400.00
Pipe specials; including all tee fittings, reducer and curved sections, concrete thrust blocks, and connections to existing line, complete in place. Sum Job 45,000.00
Article 3. Changes. The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered: Provided, however, That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the Secretary of the Army or his duly authorized represent *280 ative, adjust any such, claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 15 hereof. But nothing provided in this article shall excuse the Contractor from proceeding with the prosecution of the work so changed.
iji * íjt iji *
Article 15. Disputes. Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer subject to written appeal by the Contractor within 30 days to the Head of the Department concerned or his duly authorized representative whose decision shall be final and conclusive upon the parties hereto. In the meantime the Contractor shall diligently proceed with the work as directed.
6. On or about November 24, 1948, defendant’s contracting officer advised plaintiff that defendant had accepted Preload’s pipe design and specifications “in principle” and on November 29,1948, issued to plaintiff a notice to proceed. Plaintiff received this notice December 1, 1948.
THE LETTER OE DECEMBER 7, 1948
7. By letter of December 7, 1948, defendant’s resident engineer notified plaintiff that the proposed pipe was “conditionally approved.” The letter reads as follows:
Reference is made to letters from Preload Central Corp. to District Engineer, St. Louis District, dated 6 November 1948, subject, “Invitation No. Eng-23-065-49-56, Relocation of 54-Inch Concrete Water Line at Chain of Rocks Canal, Madison County, Illinois,” with which they submitted for approval a brochure containing their preliminary plans, specifications, and design data covering prestressed concrete pipe proposed for use in the relocation of the 54-inch raw water line at this project.
Reference is also made to letter from Preload Central Corp. to District Engineer, St. Louis District, dated 19 November 1948 transmitting prints of revised prints of drawings 8P535-2 and 8P535-3 showing changes in reinforcement and joint details for the proposed pipe.
The pipe is conditionally approved as follows:
*281 1. Referring to paragraph 4.2, page 8, of the brochure, the leakage test shall be made with a holding pressure equal to 125 ft. head instead of 115 ft. head as mentioned in said paragraph.
2. A section of the pipe, selected at random, shall be subjected to transverse and bending tests of twice the maximum loads expected to be imposed. The anticipated loading shall be considered to consist of that which will be created by a water stage of 437.5 feet in the canal plus the weight of the load of the levee over the pipe, assuming that the embankment material is saturated sand weighing 125 pounds per cubic foot. (See paragraph 2.04(b) of the contract specifications.) The above tests shall be made at no expense to the Government, except the cost for inspection of the manufacture of the pipe and witnessing of the tests. (See paragraph SC-19 (f) of the contract specifications.)
3. Retailed shop drawings (including general drawings) of the pipe will be submitted for approval in accordance with the provisions of paragraph SC-06 of the contract specifications.
The quantities of pipe designated Resigns Nos. 2 and 3 in the table on Preliminary Rrawing No. 8P535-2 of the brochure appear to have been inadvertently transposed. It is believed that 1700 linear feet of Resign No. 3 pipe and 700 linear feet of Resign No. 2 pipe were intended, instead of the quantities shown.
From dimensions shown in the preliminary data, it is assumed that the pipe will be manufactured in sections with 16 feet, laying length, which length will be acceptable. However, it is intended that the same respective quantities of concrete and timber pile bents for supporting the pipelines across Choteau Slough and at the canal crossing, will actually be constructed as are shown on the contract drawings. In order that each of these bents may be located most advantageously with respect to the ends of pipe sections in the event the pipe is manufactured in 16-feet (sic) sections, it may be necessary to deviate from the uniform spacings of these bents shown on the contract drawings. In preparing the contract drawings, it was assumed that the pipe sections would be 12 feet long. If 16 feet (sic) long sections are to be used, it will be necessary to obtain approval of the pile bent locations to be employed. Your letter dated 6 Recember 1948 is assumed to cover your desires in the matter.
*282 Rigid adherence to the specifications during manufacture and curing of the pipe will be required. Inspection will be made by this office.
Special attention is invited to paragraph 4.8 of the brochure wherein the Preload Central Corp. guarantees the pipe against leaks and breaks due to defective materials, workmanship or faulty design for a period of two years after the field test.
8. Plaintiff by letter dated December 8, 1948, transmitted to Preload a copy of defendant’s conditional approval of December 7. In a reply to plaintiff on December 11, 1948, Preload stated:
We will accept the conditions of this approval, however, before we write a formal acceptance we would like to check our design for exterior loading on the pipe. You will note that the original specifications use the general wording — -“Safely withstand the load” — and this acceptance specifically states that the pipe shall withstand twice the maximum loads.
9. Plaintiff and Preload thereafter entered into a formal contract dated December 23, 1948, but made as of October 28, 1948, under which Preload formally agreed to manufacture and furnish pipe for the contract plaintiff had with defendant. The agreement between plaintiff and Preload stated in part:
* * * River and Preload have had certain discussions with the U.S. Army as to the design features of said Pipe, which the Army has conditionally approved and which conditions have been accepted by Pre-load; * * *
10. The plaintiff now claims that the December 7 letter’s requirement of tests at twice the expected maximum loads exceeded the specifications, was not normal or necessary, required modification of design and excess prestressing, and was thus in excess of the contract, constituting a change in the contract for which it should have been compensated by the defendant.
11. In considering the claim that the conditions imposed by the December 7 letter were unreasonable, the Corps of Engineers Claims and Appeals Board found as follows:
* * * River and Preload unqualifiedly undertook to perform the work in conformity with the plans, specifi *283 cations and field conditions of the contract, and subject to the Government’s further requirements of 7 December 1948, prior to Preload’s contract with Eiver.
$ $ $ $ $ sg: 4.*
* * * the 3-edge bearing test required and performed was contemplated or included in the original proposal as conditionally accepted and was not a change later ordered by the Government.
12. Plaintiff’s expert witness at the trial testified that it was reasonable to interpret the phrase “transverse and bending tests of twice the maximum loads expected to be imposed,” used in the December 7 letter, as referring to 3-edge bearing (transverse) and beam (bending) tests. There was also evidence before the Appeals Board by Preload’s chief engineer that the 3-edge bearing test was specified by the December 7 letter and was part of the original design and that any design revisions required were minor.
13. There was some evidence before the Appeals Board that the requirement of a 3-edge bearing test at twice the expected maximum load was not normal to the industry for designs of the type of pipe here involved, that the requirement had not been anticipated by Preload and that as a result certain changes had to be made in the original design as submitted on November 6,1948. However, there was also evidence that Preload was familiar with and had performed a similar 3-edge bearing test on prestressed pipe on an earlier occasion in Canada. There was no testimony offered before this court that the requirements of the December 7 letter were unreasonable or unanticipated by Preload.
14. There was no evidence before the Appeals Board or before this court that Preload did not accept the conditions imposed by the December 7 letter and undertake to produce the pipe in conformity therewith prior to its contract with plaintiff. The Appeals Board finding that Preload undertook to perform the work in conformity with the requirements of the December 7 letter was supported by substantial evidence and was not arbitrary or capricious.
15. During the period between December 7, 1948 and February 14, 1949, the defendant negotiated with the St. Louis and Interurban Water Company, the owner of the water line, with respect to the design and specifications for *284 the new pipe. The conclusion of the negotiations resulted in a new requirement that steel cylinders be incorporated in those sections of pipe which would pass under the canal.
16. On February 7,1949, F. B. Spencer, plaintiff’s general manager, wrote to the defendant, stating:
As you know, we have been working on a small time basis doing certain excavating work at this site but in view of the delay that has been occasioned by this change, we see no point in wasting money excavating under the current difficulties of weather, etc. Therefore, we have stopped work on this project for the time being and will not start up again until either the pipe is in sight or the weather conditions have improved, or both.
17. On February 9, 1949, Greer A. Allen, defendant’s acting resident engineer, wrote to plaintiff in part, as follows:
^Reference is made to your letter of 7 February 1949, advising that you have suspended operations under Contract No. W-23-065-eng-1572 for relocation of 54" water line until either the pipe is in sight or weather conditions have improved, or both.
While this office is cognizant of the factors which have delayed the manufacture of the concrete pipe for the 54" water line, your attention is invited to the fact that this action on your part can in no way be considered as justification for an extension of time for contract performance.
18. On February 11, 1949, defendant’s contracting officer wrote to plaintiff as follows:
Eeference your letter dated 7 February 1949 concerning the delays that have been experienced as a result of the change in the type of concrete pipe to be used under the canal prism in connection with your contract No. W-23-065-eng-1572.
This will acknowledge that work under your contract has been delayed due to the change in the type of pipe to be used for the canal crossing and that an extension of time is justified. This office is currently preparing a separate contract modification to provide for an extension of time that will be forwarded to you for signature in the near future. The preparation of this modification has not advanced to a point where the exact determination of the time extension can be made. However, *285 a detailed analysis of this situation will be presented to yon in the letter transmitting the modification.
This office does not agree, however, with your contention that the canal portion of the pipe is the first to be made, inasmuch as there has never been any question concerning the design of the pipe for the landline and work on that portion of your contract would not be affected. Actually, it is considered highly desirable that you review the scheduling of all features of this work in an effort to effect the connections to the existing water line and the construction of the land portions prior to the summer season. This is considered especially important inasmuch as the East St. Louis & Interurban Water Company’s peak load occurs during the summer months.
Your attention is invited to the fact that a progress schedule has not been submitted to this office covering this contract. Such a schedule should be prepared and submitted through the Resident Engineer as soon as practicable after you receive the contract modification from this office covering the time extension.
19. The change involving steel cylinders was incorporated in modification No. 1 to the contract dated February 14, 1949. The modification provided for an $8,000 increase in the contract price. Supplement No. 1 to the modification, issued December 16,1949, increased the time for performance under the contract by 21 calendar days. Plaintiff accepted the changes without reservation and has received the benefits from them. There was no evidence presented in the trial before the court to indicate that this modification was the cause of any delay or loss for which plaintiff has not been fully compensated.
20. There was evidence before the Corps of Engineers Claims and Appeals Board that on February 18,1949, Pre-load submitted to defendant a revised design and specifications to meet the requirements stipulated in the December 7, 1948, letter and in modification No. 1. As noted in finding 12, the revisions of design were admittedly minor.
THE LETTER OE MARCH 23, 1949
21. On March 23,1949, defendant’s contracting officer sent the following letter to plaintiff:
There is transmitted herewith a print of drawing No. CR 62/13.2 on which are indicated, in red, loads to be *286 used in the design of various sections of the 54" water line being relocated under your contract No. W-23-065eng-1572.
In accordance with the understanding reached in conference on 18 March 1949 between your Mr. Spencer and Mr. Middendorf of the Preload Central Corporation and representatives of this office, 3-point bearing tests will be performed as follows for each loading condition shown on the inclosed drawing except for that part of the pipe which is to be carried on pile bents over Chouteau Slough:
(1) The pipe shall be subjected to a test load equal to that shown on the inclosed drawing. For this loading condition the pipe shall not crack.
(2) The test load shall then be increased to twice the amount of the load applied in (1) above. The pipe shall be so designed that under this maximum test load the pipe shall not fail.
(3) The test load shall then be decreased to that applied in (1) and the internal pressure test applied in the applicable amount prescribed in paragraphs 2-04(b) (1) and (2) of the specifications. For this combined external and internal loading condition the pipe shall not leak.
For that part of the pipe which is to be carried on pile bents over Chouteau Slough, beam tests shall be performed as follows:
(1) An external load equivalent to 4,300 lbs. per lin. ft. of pipe shall be applied either as a uniformly distributed load for the entire 16-ft. length of pipe or as an equivalent concentrated load (34,400 lbs.) applied at the midpoint of the pipe. For this loading condition the pipe shall not crack.
(2) The external load shall then be increased to 1 % times the load given in (1), and the pipe shall not fail.
(3) The external load shall then be decreased to that shown in (1) and an internal pressure load equivalent to a hydrostatic head of 75 ft. shall be applied. Under this combined external and internal loading condition, the pipe shall not leak.
It is understood that the Preload Central Corporation plans to test one section of pipe to destruction as a matter of information to all concerned.
It is requested that prior to incorporation in the pipe pressure tests for water-tightness on each steel cylinder be made in an amount to induce 25,000 p.s.i. tension in *287 the cylinder instead of 20,000 p.s.i. indicated in paragraph 3.3, page 4 of the brochure of the Preload Central Corporation revised 18 February 1949.
Further, it is requested that the brochure dated 18 February 1949 be revised to conform with the above requirements and with those modifications agreed to at the conference in this office on 3 and 4 February between representatives of the River Construction Corporation, Preload Central Corporation, East St. Louis and Interurban Water Company, and this office, as confirmed in our letter to you of 14 February, and resubmitted for approval.
22. The photostatic copy of drawing No. CR 62/13.2, referred to in the March 23,1949, letter, introduced in evidence, does not contain the loads to be used in the design of the various sections of the water line, which the letter states were indicated in red on the drawing. There is no competent evidence before this court of what loads were indicated on drawing No. CR 62/13.2. There was evidence before the Corps of Engineers Claims and Appeals Board that the indicated loads were as follows:
Type No. 101 (Canal Pipe), 17,000 lbs. per linear foot.
Type No. 102 (Land Line Pipe), 10,000 lbs. per linear foot.
Type No. 103 (Levee Pipe), 14,000 lbs. per linear foot.
Type No. 104 (Toe Levee Pipe), 16,000 lbs. per linear foot.
Type No. 105 (Pile Bents Pipe), 13,000 lbs. per linear foot.
23. Preload, through plaintiff, protested to the defendant the requirements set forth in the March 23, 1949, letter. No pipe was manufactured pursuant to those requirements.
24. There was evidence before the Appeals Board that Professor M. G. Spangler of the University of Iowa, an eminent authority in the field of earth loads on conduits, was consulted by the parties with regard to the load requirements for the prescribed tests. The evidence indicated that the meeting with Professor Spangler resulted in his recommendation of lesser loads than had been required in the March 23 letter and that Professor Spangler’s recommendations were accepted by both parties.
*288 THE LETTER 03? APRIL 8, 1949
25. The contracting officer sent another letter to plaintiff, dated April 8, 1949, which sets forth revised requirements for 3-edge bearing test loads. The letter read, in relevant part, as follows:
There is transmitted herewith a print of drawing No. CR 62/13.2 on which are indicated, in red, loads to be used in the design of various sections of the 54-inch water line being relocated under your contract No. W-23-065-eng-1572.
In accordance with the understanding reached in conference on 1 April 1949 between Mr. Carroll of the Pre-load Central Corporation, Prof. M. Gr. Spangler, and representatives of this office, three-edge bearing tests will be performed as follows for each loading condition shown on the inclosed drawing except for that part of the pipe which is to be carried on pile bents over Chou-teau Slough and that portion under the canal prism:
There then followed the same language used in the March 23 letter, quoted in finding 21, plus the following pertinent selected paragraphs:
For that portion of the pipe under the canal prism an external hydrostatic test shall be performed as follows:
(1) A pressure of 38 lbs. p.s.i. shall be applied for the entire 16-ft. length of pipe. For this loading the pipe shall not crack.
(2) The external pressure shall then be increased to 2 times the load given in (1) and the pipe shall not develop a crack in excess of 1/100 inch.
>Ji tf: if:
It is understood that the Preload Central Corporation plans to test one section of pipeto destruction as a matter of information to all concerned.
It will be noted that this letter has been confined to matters of engineering. Any adjustments in contract price which may be found to be justified as a result of changes from the contract drawings and specifications will be made the subject of separate negotiations.
* ❖ * * *
Our letter dated 23 March 1949, together with marked print transmitted therewith, is hereby superseded by the *289 above instructions and marked print transmitted herewith.
í{í J]s ¥ ¥ *!•
26. The loads for the 3-edge bearing tests indicated on the drawing accompanying the April 8 letter were as follows:
Type No. 102 — 3,000 lbs. per linear foot.
Type No. 103 — 5,500 lbs. per linear foot.
Type No. 104 — 8,800 lbs. per linear foot.
27. With a letter dated May 3, 1949, Preload transmitted to the contracting officer a brochure covering the design of the pipe for the project. On May 16,1949, Preload submitted a revised proposal for the defendant’s approval. On June 3, 1949, Preload submitted its final revised proposal for the defendant’s approval.
28. The pipe was manufactured and delivered under the revised design and specifications set forth in the proposal of June 3,1949, as affected by modification No. 3, dated June 9, 1949. Modification No. 3 related to increased strength for 30 pieces of pipe, and contained certain provisions relating to partial payments. Modification No. 3 also stated:
Under Article 9 of the contract, it has been determined that delay in the performance of said contract was due to causes beyond your [plaintiff’s] control and without your [plaintiff’s] fault or negligence, namely, delays by the Government.
Therefore, the time for completion of performance under said contract is hereby extended ninety (90) calendar days.
29. The contract work was completed and accepted, and the twelfth and final partial payment under the contract was made on or about July 28,1950.
SIMTJLTANEOTTS TESTING
30. Plaintiff contends that the requirement of performing simultaneous 3-edge bearing and internal hydrostatic pressure tests, first imposed by the March 23 letter, was a change in the plans and specifications necessitating a revision in design of the pipe, resulting in higher costs to Preload for which Preload should have been compensated, and that such *290 tests were unknown in the industry and could not have been anticipated.
31. The Corps of Engineers Claims and Appeals Board in its decision of October 31, 1955, on plaintiff’s appeal from a denial of the claim by the contracting officer, decided that the requirement of simultaneous tests did not exceed the proposal, agreements and field conditions. It based its conclusion upon the following considerations:
(a) That the simultaneous exertion of internal and external pressures on the pipe simulated the field loading conditions.
(b) That prestressed pipe is flexible, so that after it is loaded to the cracking point, the deflection and crack disappear when the load is removed, and pipe which cracks at the double loads can be without leakage at the single loads.
(c) That pursuant to the letter of December 7, 1948, the designs of pipe which were submitted proposed a pipe which would not crack at twice the maximum loads, so that the pipe as already designed should have been expected to be able to pass an internal hydrostatic pressure test after a 3-edge bearing test to twice maximum.
(d) That the final proposals for design according to which the pipe was built did not require the pipe to be watertight, but only “without harmful leakage,” defined in Preload’s November 6, 1948, proposal as leakage not exceeding 100 gallons per day per inch of diameter per mile of pipe.
32. There was evidence before the Appeals Board to the effect that simultaneous tests were abnormal in the pipe industry, could not have been anticipated by Preload, and were not a reasonable requirement. There was also evidence before the board that the requirements of simultaneous tests would require that the pipe be overdesigned, with respect to the field conditions. The difficulty in performing simultaneous tests arises because of the likelihood that the pipe will crack under the 3-edge bearing test, and therefore will be unable to withstand internal hydrostatic pressure without leaking.
33. There was also evidence before the board which supported its conclusions. That evidence included the following:
*291 (a) The field conditions required the pipe to sustain internal hydrostatic pressure while subjected to the weight of the covering earth loads.
(b) Colonel John J. Zebas, the assistant chief of the engineering division of the St. Louis District of the Corps of Engineers, testified that John Carroll, president of Preload, first offered to perform simultaneous tests in order to show that if a crack developed in prestressed pipe under pressure, the crack would close up as soon as the pressure was released. This testimony was not rebutted.
(c) The plaintiff’s expert witness before the Appeals Board, Thomas H. Wiggin, a consulting engineer with 60 years of experience in work with pipe, testified that a characteristic feature of prestressed pipe is that if it is loaded to the point where it cracks, and the load is removed, the crack disappears.
(d) A report on the original design of the prestressed pipe for the Chain of Eocks Canal project, dated August 31,1951, signed by M. Fomerod, the chief engineer of Preload, states, in part:
The original design [6 November 1948] of this pipe was based on design criteria which were considered normal to the industry. Such normal tests are performed separately and on separate specimens and consist of:
‡ sjs i|i Sj< ijs
(b) A 3-edge bearing test as described for instance in the A.S.T.M. [American Society for Testing Materials] Specification C76-41 for Eeinforced Culvert Pipe. * ❖ * # *
The minimum safety factor against cracking due to external loads in a 3-edge bearing test is shown * * * to be a minimum of 1.5.
(e) Testimony before the Appeals Board indicated that, prior to the April 8 letter, in the proposal submitted on February 18, 1949, Preload changed the original design of the pipe to meet all of the requirements of the December 7, 1948, letter. One of the requirements of that letter was a safety factor of twice the expected maximum loads. Thus, there was evidence before the board that prior to the April 8 *292 letter the pipe bad been, designed against cracking at twice the expected maximum loads.
(f) The evidence before tbe Appeals Board showed that the proposals, dated May 16 and June 3, 1949, according to which the pipe was actually built, specified that in the simultaneous testing the pipe should be “without harmful leakage,” and not watertight. Preload’s original proposal of November 6, 1948, permitted leakage, in a field test, of not in excess of 100 gallons per day per inch of diameter per mile of pipe. It was reasonable to interpret the requirement that the pipe be without harmful leakage to allow permissible leakage, as did the original proposal.
¡34. In this court, the plaintiff presented one witness on the subject of the testing requirements. He was Peter Karl C. Jensen, an engineer and a well-qualified expert in the design of prestressed concrete. Jensen had never carried out or heard of the performance of a combination of 3-edge bearing and internal hydrostatic pressure tests. He testified that it would be “very difficult to guarantee” what would happen if pipe tested to its ultimate capacity by a 3-edge bearing test were subsequently tested by internal hydrostatic pressure. He testified that he would therefore design the pipe strong enough to assure that no crack would occur under the 3-edge bearing test, by introducing an additional safety factor of between 1.25 and 1.5.
35. Jensen testified that according to his calculations Pre-load’s proposal of November 6,1948, would have fulfilled the original specifications, and that the testing requirements imposed by the letter of April 8, 1949, required the designing of stronger pipe. The design of the pipe in the June 3,1949, proposal was reasonably calculated to meet the latter requirements. There was no testimony as to whether the pipe designed to meet the requirements of the December 7, 1948, letter, including a 3-edge bearing test at twice the maximum loads, should reasonably have been expected to meet the tests required on April 8. Plaintiff’s expert further testified that the method of calculation of the load factors and the assessment of the loads to be borne by a concrete pipe under water or under wet ground is a matter of some controversy among experts on the subject and that it is unlikely that any two or *293 more experts, in calculating the load to be borne by such pipe, would arrive at the same result, and that experts in this particular field often failed to agree among themselves.
36. Jensen testified that the principal difference between the design of the pipe as originally proposed and as finally proposed was that the section designated type 104 (toe levee pipe) finally had a 4-inch, rather than a 3-inch, shell thickness.
3.7, The plaintiff introduced no evidence at the trial in this court to challenge the determinations upon which the Appeals Board based its conclusion that the simultaneous testing requirement did not exceed the proposal, agreements and field conditions. The testimony in this court merely reiterated views expressed before the board to the effect that the simultaneous tests were not usual and were probably very demanding.
38. In the light of the evidence adduced before the Appeals Board which supported its conclusion with respect to simultaneous testing, as shown above, that conclusion cannot be characterized as arbitrary, capricious or unsupported by substantial evidence.
REQUIREMENT OE TESTING 16-EOOT LENGTHS OE EIRE
39. The plaintiff also contends that the defendant’s requirement that Preload perform its 3-edge bearing tests on full 16-foot lengths of pipe was unprecedented, not contemplated at the time of the bid, and constituted a change which gave rise to design changes increasing costs for which the plaintiff should be compensated.
40. The Corps of Engineers Claims and Appeals Board decided that the requirement of a 3-edge bearing test of 16-foot lengths was contemplated in the original proposal. This conclusion was based on the fact that the 3-edge bearing test as defined in American Society for Testing Materials specifications, described by the plaintiff’s witness as normal in the industry, includes no reference to the length of test specimens other than that they be sections of pipe as manufactured to order and selected at random.
41. There was evidence before the Appeals Board and the court that the 3-edge bearing test is normally performed on *294 relatively short sections of pipe, usually of between 1 and 4 feet in length. Eight-foot sections are occasionally tested, but tests of 16-foot sections are uncommon. There was evidence before the Appeals Board and the court that it would be extremely difficult to design a testing machine which would be capable of testing a 16-foot section of pipe.
,42. There was testimony before the board that if a test of a 16-foot length of pipe were required a pipe designer would normally be more conservative and design a stronger pipe than if a test of a shorter length were permitted. The plaintiff, however, presented no evidence before the board or in this court that it did, in fact, increase the design of its pipe in this case as a result of the requirement of testing 16-foot lengths.
THE USE OE THE ROCLA PROCESS
43. The plaintiff claims that, due to the testing requirements imposed by the defendant, Preload was compelled to produce its pipe by the Roela method rather than by the vacuum method, which it had originally intended to use and which is a less expensive method of manufacture. Stronger pipe can be produced by the Roela method than by the vacuum method.
44. The Appeals Board decided that any addition of costs resulting from the use of the Roela method was not a com-pensable change on the ground that Preload had decided to manufacture pipe by the Roela process before the defendant’s instructions of March 23 and April '8,1949. Therefore, the board decided, the decision to use the Roela process could not have been influenced by the requirements which the plaintiff alleges to have caused it.
45. There was uncontradicted testimony, by the plaintiff’s witness, before the Appeals Board, that Preload had decided to use the Roela process sometime in February or March 1949, and that, after a month or 6 weeks to assemble the process, it was ready to operate at the end of March or early in April. Plaintiff offered no evidence to the court that the decision to use the Roela process had not been made earlier than March 23, 1949, as permitted by the original design.
*295 46. The determination of the Appeals Board that Pre-load’s decision to use the Roela process was uninfluenced by the March 23 or April 8 requirements was supported by substantial evidence and was neither arbitrary nor capricious.
DAMAGES
47. Plaintiff’s first amended petition demands judgment against defendant for the sum of $190,213.78. This sum includes $155,647.95 for the benefit of Preload, including overhead and profit and alleged excess overhead expense in the amount of $37,648.86, the latter representing such expense allegedly incurred from December 1, 1948, the date of receipt of notice to proceed, until the middle of June 1949, a delay attributed to defendant’s changes in designs and specifications. Of the total judgment claimed, the sum of $24,125.43 therein represents plaintiff’s claimed overhead and profit, including excess overhead of $3,764.88 on account of delays attributed to defendant. $10,440.40 is claimed for certain excess rentals of well-point equipment during a period of claimed delay caused by defendant from January 15 to May 15, 1949. The verified costs and plaintiff’s requested findings of fact are at slight variance with the foregoing figures as will be shown hereafter. Plaintiff computes damages as the difference between costs of performance and what was paid for performance and seeks an equitable adjustment therefor under the changes article of the contract. Plaintiff says the Government-caused delays from December 1, 1948 to June 5, 1949, created a suspension of work reimbursable under GC-11.
48. Preload’s total labor and material costs, as verified by audit of the Federal Bureau of Investigation, and agreed to by plaintiff and Preload, were $278,538.66. Preload received payments for labor and material totaling $191,891.57. Pre-load also asserts a claim for office overhead in the sum of $38,143.59, the equivalent of 15 percent of construction costs. Further, Preload asserts a claim for $29,262.58 as profit, which is computed as 10 percent of costs. These percentages are reasonable and customary.
*296 49. Claim is asserted in plaintiff’s requested findings in tbe total of $189,435.51. Of the sum claimed, plaintiff claims $33,787.58 for itself and $155,647.93 for Preload. Pre-load’s verified costs, however, are less than those used by-plaintiff in its requested findings as the base for its computation. The difference sought for Preload between actual expenses of $278,538.66 and the $191,891.57 paid by defendant is $86,647.09 to which can be added the adjusted $38,143.59 as claimed overhead and $29,262.58 for profit, shown in the finding above, making a total of $154,053.26 for Preload’s proper portion of the claim. The latter figure added to plaintiff’s claim for $33,787.58, as increased from the $24,125.43 set forth in the amended petition although not set forth by subsequent amendment but only by requested findings, makes a total claim of $187,840.84. If the court should conclude that the $24,125.43 figure must be employed, the total claim would be reduced to $178,178.69. Plaintiff’s claim for $33,787.58 is made up of a reasonable if allowable allowance of 15 percent for overhead and profit on the $155,647.93 claimed for Pre-load, or $23,347.19, plus the $10,440.40 for well-point rentals. Fifteen percent of the adjusted figure found here of $154,-053.26 equals $23,107.99, which added to $10,440.40 for rentals gives $33,548.39 as the adjusted figure appropriately representing plaintiff’s portion of the claim. This figure added to the $154,053.25 claimed by plaintiff for Preload, computed as shown above using the verified and stipulated base figure for Preload’s costs of labor and material, results in a total claim of $187,601.65.
50. Plaintiff claims that it incurred delays as a result of the inability and failure of defendant’s contracting officer to establish final testing requirements and as a result of changes made by defendant in plans and specifications. It is contended that these acts and omissions constituted a suspension of work under paragraph GC-11 of the specifications or a breach of contract by defendant. The delay period is alleged to be from December 1,1948 to June 5,1949.
51. Overhead incurred by Preload during the entire contract period totaled $62,748.13. The plaintiff claims that time of performance totaled 358 days, from November 2,1948 *297 to November 22, 1949, when it asserts tbat tlie last pipe was shipped raider the contract. The plaintiff cited no evidence before the court showing when the last pipe was shipped. If the total time for performance was 358 days, then average daily overhead for Preload was $175.27. For the 186 days of delay claimed by Preload, overhead at the rate of $175.27 per day totals $32,600.22. Preload also claims 15 percent ($4,-890.03) of that figure as office overhead and 10 percent ($3,-749.03) as profit. The total claimed by Preload for delay is $41,239.28. Plaintiff claims, as previously noted, $10,440.40 for 4 months, January 15 to May 15,1949, for rentals on well-point equipment which could not be used in that interval on account of a delay attributed by plaintiff to defendant. In addition, plaintiff claims for itself $4,123.93 as overhead caused by the alleged suspension of work and describes the foregoing figure as 10 percent of the $41,239.28 claimed by Preload for delay. If allowable, 10 percent of the subcontractor’s costs is a reasonable amount for the general contractor’s overhead.
52. Under the contract plaintiff was required to complete the entire work not later than 180 calendar days after receipt of notice to proceed. Notice to proceed was issued on November 29,1948, and received by plaintiff on December 1, 1948. The contract completion date was thus June 8, 1949. Plaintiff began work on December 29, 1948. The performance time, however, was extended 21 days by supplement No. 1 to modification No. 1, dated December 16,1949, and 90 days by modification No. 3, dated June 9,1949. The contract completion date was thus extended to September 27, 1949. As found heretofore, work was completed on or about July 28, 1950.
53. The Appeals Board found that:
There is no evidence and no charge that the Government was negligent or dilatory in attempting to resolve the disagreements as to loads and tests. We affirmatively find that the Government was diligent in these matters.
There was testimony before the Appeals Board that much of the delay in commencing work under the contract was due to continuing negotiations between the parties with reference *298 to the loading and testing requirements for the pipe, as well as by time used by Preload in revising designs.
54. The Appeals Board rejected the claim for well-point rentals saying that the contracting officer was correct in doing so because he had not directed a suspension of work under paragraph GC-11 of the contract specifications. The board, also, pointed out that plaintiff voluntarily quit work from February 7 to April 7,1949, because of difficulties with weather. As to the other claims for delay the board said in rejecting the same:
River and Preload did not submit the revised proposal giving design data required by the conditions of the Government’s approval of 7 December 1948 until 18 February 1949. The interim was spent in discussions relating to questions of interpretations of those requirements, and the changes as to steel cylinders in the canal pipe. The steel cylinders were not a feature of pipe design and the remainder of the pipe was not affected by the steel cylinder change. River prosecuted its work until 7 February when it suspended activities, giving the steel cylinder change and difficulties of weather as its reason. We conclude the appellant [River] and Preload were not without fault or negligence in delaying submission of its revised design until 18 February 1949, and that River’s cessation of work was influenced materially by the weather.
The appellant [River] and its pipe subcontractor [Preload] anticipated a preparatory period of approximately 60 days notice by contractor to its supplier to proceed. For the purpose of their agreement, 24 November 1948 was recited as the date of said notice, but Preload was still bidding and negotiating with River until 28 December 1948. Certainly 24 November could not be regarded as the effective date for pipe operations when River did not receive its own notice to proceed from the Government until 1 December 1948, and neither had conditional approval of the proposed design of pipe until receipt of the letter of 7 December 1948.
The delay following the receipt by the Government of the redesign of 18 February until 1 April 1949 was caused, insofar as this record reveals, by the disputes over the tests and external loads. To put an end to the arguments, the contracting officer gave explicit orders in his letter of 23 March 1949, but reconsidered and compromised on the loads on 1 April. The record does *299 not bear out the allegations of appellant’s [River’s] that the tests and loads were so erroneous and excessive that they wrought a change in the contract terms as conditionally approved and accepted. Rather, we find the reverse to be generally true. Five of the six tests were within the agreed terms, and on such evaluation as is permitted by the evidence of record the controversial final loads were adjusted by compromise.
There was no lack of diligence by the Government in treating with appellants and in attempting to reach acceptable solutions. The interval from 18 February to 1 April was consumed in efforts to arrive at such solutions of factual disputes.
We discern in the delays consequent upon these disputes nothing which was necessary or desirable for the convenience of the Government. On the contrary, the appellants had a clear and appropriate contractual remedy under Articles 3 and 15 which, if invoked, would have obviated this delay. Those Articles provide that if the parties fail to agree upon a dispute of fact the dispute shall be decided by the contracting officer subject to written appeal by the contractor; but that nothing shall excuse the contractor from diligently proceeding with the prosecution of the worlc as directed. That was the relief promised by the contract for the claimed changes, not the unrelated relief for suspension of the work.
If the vigorous remonstrance by the appellants prevented or caused a retraction of erroneous requirements for which the Government could have ultimately been liable, that might serve to raise an equity in its favor. But this Board does not pass upon matters of equitable jurisdiction, and makes no such finding.
_ The 90 days extension of time granted by Modification No. 3 appears in the change order describing and requiring a change in the specifications and additional work. No “acts of the Government” creating a delay are named in the order and none were alleged or proved by appellants, other than the change itself. Recovery cannot be had for delays caused by an authorized change in the contract, where there is no abuse of the right to make such changes. Langevin v. United States, 100 Ct. Cl. 15; Magoba Construction Co. v. United States, 99 Ct. Cl. 662. The mere fact that deliberations preliminary to a change cover a substantial period of time and the contract was extended as a result does not become a basis for recovery of damages. B-W Construc *300 tion Co. v. United States, 97 Ct. Cl. 92. See also C&A No. 685.
We decide from the foregoing that the Government did not order a delay for its convenience in suspension of work, nor commit such acts as prevented or impeded progress of the work by appellants, thereby involving the doctrine of a nunc pro tunc de facto suspension. The appellants were free to proceed at will. This they refused to do until delays ensued over disputes concerning issues of fact. The contract provides a clear and certain remedy under the changes article for the claims asserted. The claims for changes are not metamorphosed into claims for suspension at the whim of claimants and in derogation of the contractual terms.
This item of appeal is denied.
55. At the trial of this action before the Commissioner of the court, the plaintiff introduced into evidence the entire record before the Corps of Engineers Claims and Appeals Board and presented two witnesses. An expert testified generally concerning conformance of the design of the pipe set forth in Preload’s original proposal with the requirements of the invitation to bid. It was his opinion that the engineering data incorporated in plaintiff’s original submission with respect to the design of the pipe met the requirements of the invitation to bid. Preload’s vice president, an accountant, testified that plaintiff’s total costs incurred were as verified by defendant’s auditors, arose from this job, and suggested the proper percentages thereof which should be added for overhead and profit.
56. Plaintiff offered no proof in support of the allegations set forth in the petition concerning delays incurred by plaintiff as a result of the allegedly wrongful acts of defendant which are claimed to have resulted in increased costs to plaintiff and Preload.
57. Plaintiff has offered no proof of damages in support of its allegation that the costs allegedly incurred by Preload in excess of the contract price were in any way attributable to any act of defendant or due to this contract,
58. Plaintiff has failed to sustain its burden of proof on its allegations in the petition to the effect that the findings and decisions of the Appeals Board on its claims were arbitrary *301 and not supported by substantial evidence. The decision of the board, dated October 31, 1955, is, therefore, final and conclusive. The Trial Commissioner allowed, subject to approval of the court, a motion to dismiss submitted by defendant pursuant to rule 49(c) at the close of plaintiff’s proof.
CONCLUSION OK LAW
For the reasons stated above and upon the findings of fact made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover. The action of the Trial Commissioner to dismiss the case, subject to the approval of the court, pursuant to rule 49(c), is affirmed and the petition is dismissed.

 The distinction between law and fact is sometimes difficult. Tbe subject bas received tbe attention of many judges and legal scholars. See, for instance, Birnbaum, Questions of Lem and Fact and the Jurisdiction of the ASBOAj Spector, Wile Co. v. United States and Associated Traders v. United States, 19 Federal Bar Journal, April 1959.